IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOETTE PAULONE,

    *Plaintiff,*

    v.                                      Civil Action No.: ELH-09-2007

CITY OF FREDERICK, *et al.*,

    *Defendants.*

**MEMORANDUM OPINION**

In July 2009, Joette Paulone, plaintiff, sued the Board of County Commissioners of

Frederick County (the "County"), and the State of Maryland (the "State"), defendants,[1] alleging

violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as well as a common law claim

for negligent training and supervision. The claims pertain to events that followed plaintiff's

arrest on July 31, 2008, by City of Frederick (the "City") police on charges that plaintiff, who is

deaf, was driving while impaired by alcohol ("DWI"). Plaintiff contends that defendants

discriminated against her on the basis of her disability during her post-arrest detention, her initial

appearance before a State district court commissioner,[2] and her attendance at alcohol education

---

[1] Paulone also sued the City of Frederick and Charles Jenkins. Jenkins, the Sheriff of Frederick County (the "Sheriff"), was sued in his individual capacity. On October 20, 2009, plaintiff voluntarily dismissed her claims against the City of Frederick (Counts I, II, and VI), with prejudice (ECF 30). On February 17, 2010, Judge Quarles dismissed Paulone's claim against the Sheriff, based on statutory immunity (ECF 34). (The count was erroneously labeled "Count VII"; it was actually Count VIII. The count alleged negligent training and supervision by both the County and Jenkins, but was dismissed only as to Jenkins.) The case was reassigned to me on January 17, 2011.

[2] In the context of this case, "district court" refers to the District Court of Maryland, which is a state trial court of limited jurisdiction, and not the United States District Court. *See*

classes and a victim impact panel, which were requirements of the probation sentence she received for the DWI charge. Paulone seeks declaratory and injunctive relief, monetary damages, attorney's fees, and costs. *Id.*

The parties have filed cross-motions for summary judgment, and have extensively briefed the issues. No hearing is necessary. *See* Local Rule 105.6. For the reasons that follow, the Court will grant the County's motion, and will grant in part and deny in part the summary judgment motions filed by plaintiff and the State.

## Factual Overview[3]

At approximately 11:48 p.m. on July 31, 2008, City Officer Scott McGregor stopped plaintiff on suspicion of DWI. Affidavit of Scott McGregor at 1 ("McGregor Aff.") (ECF 60-1); *see also* Memorandum in Support of Plaintiff's Motion for Summary Judgment at 1 ("Pl. MSJ") (ECF 52-1); County's Memorandum in Support of Summary Judgment at 2-3 ("County MSJ") (ECF 51-1). After administering field sobriety tests to Paulone, McGregor arrested her and transported her to Frederick Police Headquarters. *See* McGregor Aff. at 2; Pl. MSJ at 2; County MSJ at 2-3. Then, at approximately 2:30 a.m., McGregor transported Paulone to the Frederick County Adult Detention Center (the "Detention Center" or "FCADC"), operated by the Frederick County Sheriff's Office. *See* McGregor Aff. at 2; Pl. MSJ at 2; County MSJ at 3.

---

Md. Code (2006 Repl. Vol., 2010 Supp.), §§ 1-601 *et seq.* & §§ 4-101 *et seq.* of the Courts & Judicial Proceedings Article.

[3] In considering a motion for summary judgment, a court must view the facts in the light most favorable to the non-moving party. *See, e.g.*, *News and Observer Publishing Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). In this section of the opinion, I will set forth the basic facts on which the parties agree. In my discussion of the issues, I will present the facts in greater detail (elucidating, where applicable, the parties' disputes of fact).

Plaintiff was in custody at the Detention Center from approximately 2:30 a.m. until approximately 7:00 to 8:00 a.m. on August 1, 2008. The parties agree that an interpreter was not provided to plaintiff during her detention, and that any communication between plaintiff and Detention Center personnel took place by means of written notes.[4] *See* County MSJ at 3-5; Pl. MSJ at 2-4. The parties also agree that Detention Center personnel gave plaintiff the opportunity to make several phone calls by means of a teletypewriter ("TTY" or "T.T.Y.").[5] *See* County MSJ at 3-5; Pl. MSJ at 2-4.

At approximately 7:00 a.m., plaintiff appeared before Maryanne Riggin, a district court commissioner. Under Maryland law, a district court commissioner is a judicial officer who is appointed by the administrative judge of the judicial district, and need not be a lawyer. *See* Md. Code (2006 Repl. Vol., 2010 Supp.), § 2-607(a)(1), (b)(1) of the Courts & Judicial Proceedings Article ("C.J.") (appointment and requirements of district court commissioners); Md. Rule 4-102(f) (2010) (district court commissioners are judicial officers). A district court commissioner's responsibilities include conducting "initial appearances" for persons who are arrested without a warrant, including arrests made at times when the courts are not open. As discussed in more detail, *infra*, a district court commissioner must determine at the initial appearance whether there was probable cause for the defendant's arrest, advise the defendant of various constitutional rights and procedural requirements, and determine whether the defendant

---

[4] The parties disagree as to the timing, extent, and efficacy of the written communications.

[5] The parties use different shorthand references for a teletypewriter. Unless quoting, I shall use the shorthand reference of TTY. The parties disagree as to whether the TTY device was functional and, consequently, whether plaintiff was successfully able to make the calls.

will be released pretrial (and, if so, the amount of any bond).  *See generally* C.J. § 2-607(c); Md. Rules 4-213 & 4-216.

In this case, the district court commissioners' office was located next to the Central Booking Unit at the Detention Center.  County MSJ at 3.  Riggin recounts in her affidavit that unsuccessful attempts were made to procure an American Sign Language ("ASL") interpreter for Paulone's initial appearance.  *See* Affidavit of Maryanne Riggin ("Riggin Aff.") ¶¶ 3-4, Ex.2 to Memorandum in Support of State of Maryland's Motion for Summary Judgment ("State MSJ") (ECF 53-3).  In any event, the parties agree that plaintiff's initial appearance before Commissioner Riggin was not facilitated by use of an ASL interpreter, and that communication between Commissioner Riggin and plaintiff occurred by means of handwritten notes. Commissioner Riggin released plaintiff on her own recognizance at approximately 7:23 a.m., and plaintiff left the Detention Center by taxicab.  *See* Pl. MSJ at 3; County MSJ at 5-6.

On October 7, 2008, plaintiff appeared with counsel in the District Court of Maryland for Frederick County.  Pl. MSJ at 3; State of Maryland's Mem. in Support of Its Opp. to Pl. MSJ ("State Opp.") at 7.  The hearing was facilitated by use of an ASL interpreter. State Opp. at 7. Plaintiff pleaded guilty to DWI, and was sentenced to probation before judgment, pursuant to Md. Code (2008 Repl. Vol., 2010 Supp.), § 6-220 of the Criminal Procedure Article.[6]  *See* Defendant Trial Summary at 1, Ex.3A to State MSJ (ECF 53-8).  As conditions of her probation, Paulone was required to attend "Victim Impact Panel meetings" presented by Mothers Against

---

[6] Under Maryland law, "probation before judgment" is a type of disposition that is not considered a "conviction" for most purposes; "a person who receives probation before judgment is not convicted of the crime for which he has been found guilty, unless the person violates the probation order and a court enters a judgment on the finding of guilt."  *Myers v. State*, 303 Md. 639, 647-48, 496 A.2d 312, 316 (1985).

Drunk Driving ("MADD"), and to "[s]ubmit to alcohol and drug evaluation, testing, and treatment as directed" by plaintiff's probation monitors at the Drinking Driving Monitor Program ("DDMP") of the State's Division of Parole and Probation. Probation Summary, Ex.3B to State MSJ (ECF 53-9).[7]

According to an affidavit of Mark Lucas, one of plaintiff's probation monitors through DDMP, plaintiff was required to undergo an alcohol treatment evaluation by a State-certified addictions counselor. Affidavit of Mark Lucas ("Lucas Aff.") at 3, Ex.3 to State MSJ (ECF 53-7). The monitors also instructed plaintiff to attend a MADD victim impact panel on February 4, 2009. Lucas Aff. at 4. The record reflects that plaintiff's DDMP monitors rejected her requests for State-provided ASL interpreters at the impact panel and at her evaluation, taking the position that it was plaintiff's responsibility and/or that of MADD and plaintiff's addictions counselor to provide interpreters. Lucas Aff. at 4. Plaintiff attended the MADD victim impact panel on February 4, 2009, without an interpreter. Pl. MSJ at 4.

Plaintiff was evaluated by Laura Dreany-Pyles, BSW, CAC-AD,[8] a certified addictions counselor who is also deaf, and who was employed by Deaf Addiction Services at Maryland ("DASAM"), a substance abuse program for deaf or hearing-impaired individuals, based at the University of Maryland at Baltimore. Pl. MSJ at 15. Dreany-Pyles concluded that plaintiff did not require addiction treatment. *Id.* Plaintiff's DDMP monitors then directed plaintiff to enroll, no later than March 17, 2009, in a State-certified six-week or twelve-hour alcohol education

_____

[7] Plaintiff was also required to meet periodically with her DDMP probation monitors. As explained, *infra*, that condition is no longer at issue.

[8] BSW stands for "Bachelor of Social Work," and "CAC-AD" stands for "Certified Associate Counselor – Alcohol and Drug," which is a regulated health occupation in Maryland. *See* Md. Code (2009 Repl. Vol., 2010 Supp.), §§ 17-401(b)(2) & 17-403 of the Health Occupations Article.

class, which was, under DDMP policy, required for alcohol offenders who do not need addiction treatment. Lucas Aff. at 5. DDMP provided plaintiff with a list of class providers, which included DASAM. *Id.* DDMP also advised Plaintiff that she was required to make arrangements for an interpreter. Pl. MSJ at 4.

Plaintiff sought unsuccessfully to locate a course in the Frederick area with an interpreter. She tried to contact several course providers, who either did not call her back, did not accept her insurance, or would not provide an interpreter. Pl. MSJ at 4. On March 31, 2009, DDMP filed a violation of probation ("VOP") charge against plaintiff for failure to enroll in the alcohol education class. *See* Statement of Charges, Ex. 5A to Pl. MSJ (ECF 52-9).

Prior to the VOP hearing, plaintiff learned that Ms. Dreany-Pyles (of DASAM) could conduct the alcohol education course in sign language, via videophone, and she enrolled in the class. Pl. MSJ at 5. At the VOP hearing on June 2, 2009, the court granted DDMP's request to dismiss the VOP charge and terminate supervision. *See* Tr. of VOP Hearing, Ex.3 to State Opp. (ECF 62-4).

### Procedural Summary

As noted, plaintiff filed suit in July 2009. In September 2009, the State filed a Motion to Dismiss or, in the Alternative, for Summary Judgment ("State's Motion") (ECF 22). In a reported Memorandum Opinion and Order entered February 17, 2010 (ECF 33 & 34), Judge Quarles granted the State's Motion, in part, and denied it, in part. *Paulone v. City of Frederick*, 718 F. Supp. 2d 626 (D. Md. 2010).[9]

---

[9] Judge Quarles treated the State's Motion as one for summary judgment. *Id.* at 633.

As to plaintiff's ADA claim against the State (Count V), Judge Quarles reviewed plaintiff's contentions regarding the discrete events alleged in the Complaint. First, with respect to plaintiff's post-arrest detention and processing, Judge Quarles determined that plaintiff "stated a claim for disability discrimination . . . under the ADA," because she alleged that "necessary steps were not taken to ensure her communication": specifically, "(1) use of a working TTY machine to call from the Detention Center, (2) help in reading and understanding forms, and (3) access to a sign language interpreter." *Id.* at 635 (footnote omitted). Second, regarding court-ordered meetings with plaintiff's probation monitors through DDMP, Judge Quarles granted summary judgment in favor of the State, because the State had "shown that it provided an interpreter for Paulone during her meetings with DDMP monitors," with the exception of her initial intake meeting, for which plaintiff had not requested an interpreter. *Id.* at 636. Third, with respect to plaintiff's court-ordered attendance at a MADD victim impact panel and the alcohol education classes, Judge Quarles observed that the State had denied plaintiff's requests for interpreters, *id.* at 636 n.28, and rejected the State's argument that provision of an interpreter was the sole responsibility of MADD and/or the alcohol education providers. *Id.* at 636. He stated: "Maryland has provided no evidence that one of the eight DUI education class providers or MADD had a deaf accessible program. Maryland may be liable if none of the programs Paulone was required to attend provided interpreters." *Id.* (citation omitted). Accordingly, he denied the State's motion for summary judgment with respect to the provision of interpreters at the MADD panel and the alcohol education class.

Judge Quarles also denied the State's Motion with respect to plaintiff's negligent training and supervision claim (Count IX), reasoning that Paulone had complied with the notice

requirements of the Maryland Tort Claims Act ("MTCA"), codified at Md. Code (2009 Repl. Vol., 2010 Supp.), § 12-106(b) of the State Government Article ("S.G."), and had adequately stated a claim for negligence. *Id.* at 636-38. However, Judge Quarles dismissed plaintiff's Rehabilitation Act claim (Count VI), on the ground that the Rehabilitation Act applies only to a "program or activity" that receives "federal financial assistance." *Id.* at 634. According to Judge Quarles, "[b]ecause Paulone failed to allege that any program or activity implicated by the complaint received federal funds, her Rehabilitation Act claims against Maryland must be dismissed." *Id.*

On March 3, 2010, the State filed a Motion for Reconsideration (ECF 37). As to plaintiff's negligent training and supervision claim, the State argued that it was immune from suit under the Eleventh Amendment to the United States Constitution. Although plaintiff had complied with the prerequisites of suit under the MTCA, the State contended that the MTCA's waiver of sovereign immunity applies only to suits brought in state court, not federal court. With regard to plaintiff's ADA claim concerning the alcohol education classes, the State submitted a listing of the available classes, showing one that was taught in sign language, offered by DASAM.

Judge Quarles issued an unreported Memorandum and Order (ECF 46 & 47) on July 26, 2010, granting in part and denying in part the State's Motion for Reconsideration. Judge Quarles dismissed plaintiff's negligence claim against the State (Count IX) on the ground of sovereign immunity. However, he declined to reconsider his ruling regarding the alcohol education classes, stating that the "Court does not reconsider its previous decisions based on evidence that was available but not provided with the original motion." Mem. at 8 (ECF 46). He added:

"[A]lthough this evidence might support a motion for summary judgment on Paulone's ADA claims against Maryland, the Court will not grant reconsideration based on omitted evidence." *Id.*

Therefore, Counts I, II, VI, VII, VIII (with respect to Sheriff Jenkins only), and IX have been dismissed, and plaintiff's ADA claims against the State (Count V) have been dismissed in part. The following claims remain: (1) the balance of plaintiff's ADA claims against the State (Count V), which concern her post-arrest detention and processing, including her initial appearance before District Court Commissioner Riggin, and her attendance at the MADD victim impact panel and alcohol education classes; and (2) plaintiff's claims against the County, alleging violations of the ADA and Rehabilitation Act, as well as negligent training and supervision (Counts III, IV, and VIII), all concerning her post-arrest detention at the FCADC.

## Standard of Review

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment.[10] Under Fed. R. Civ. P. 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *See*

---

[10] Rule 56 was amended, effective December 1, 2010, after the motions at bar were filed. The amendments "govern in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending" as of their effective date. 559 U.S. ___, 130 S. Ct. ___, 176 L. Ed. 2d vii (April 28, 2010). However, the amendments are "not intended to change the summary-judgment standard or burdens." Rpt. of the Jud. Conf. Cmte. on Rules of Practice & Procedure, at 14 (Sept. 2009).

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 822 (2003). "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Wright, Miller & Kane, Federal Practice & Procedure § 2720, at 336-37 (3d ed. 1998, 2010 Supp.).

**Discussion**

A. Statutory Background

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2). Title II of the ADA, which is at issue here, prohibits public entities, including "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," *id.* § 12131(1), from discriminating "by reason of" disability against a "qualified individual with a disability." *Id.* § 12132.[11]

For purposes of Title II, a "qualified individual with a disability" is defined as an individual with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). There is no dispute that plaintiff is a qualified individual with a disability, and that defendants are public entities subject to Title II of the ADA.[12]

_____

[11] Title I of the ADA prohibits discrimination against individuals with disabilities in employment. *See id.* §§ 12111 *et seq.* Title III applies to public accommodations. *See id.* §§ 12181 *et seq.*

[12] In addition to prohibiting discrimination by the states on the basis of disability, the ADA contains a provision abrogating the states' sovereign immunity under the Eleventh Amendment. *Id.* § 12202. This provision is not valid under all circumstances. *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) (holding ADA's immunity-stripping provision invalid with respect to Title I of the ADA). *But see United States v. Georgia*, 546 U.S. 151 (2006) (holding that Title II of ADA validly abrogates sovereign immunity with respect to

The Rehabilitation Act was enacted some seventeen years before the ADA. Title II of the ADA and § 504 of the Rehabilitation Act are closely related, and to "the extent possible, [courts] construe similar provisions in the two statutes consistently." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002). *See Rogers v. Dept. of Health & Environmental Control*, 174 F.3d 431, 433-34 (4th Cir. 1999) (stating that courts may apply Rehabilitation Act precedent in interpreting the ADA, and vice versa). Indeed, the statutes "share the same definitions of disability," *id.* at 433, and Title II of the ADA explicitly provides that "[t]he remedies, procedures, and rights" provided under § 504 of the Rehabilitation Act "shall be the remedies, procedures, and rights [that Title II of the ADA] provides to any person alleging discrimination on the basis of disability. . . ." 42 U.S.C. § 12133.[13]

Pursuant to Congressional and Executive mandate, the Department of Justice has promulgated regulations interpreting and implementing both Title II of the ADA and § 504 of the Rehabilitation Act.[14] The regulations under the two statutes must be "consistent" with each

---

state prisons); *Tennessee v. Lane*, 541 U.S. 509 (2004) (holding that Title II of ADA validly abrogates sovereign immunity with respect to physical access to state courts by persons with disabilities); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005) (holding that Title II of ADA validly abrogates sovereign immunity of state institutions of higher education). In this case, however, the State does not contend that it is entitled to sovereign immunity from plaintiff's ADA claims.

[13] In turn, the Rehabilitation Act incorporates by reference the "remedies, procedures, and rights" established by Title VI of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000d *et seq.*), which prohibits discrimination on the basis of race, color, or national origin by recipients of federal financial assistance. 29 U.S.C. § 794a(a)(2). Accordingly, courts look to Title VI precedent to resolve remedial and procedural issues arising in Rehabilitation Act and ADA Title II cases.

[14] Congress expressly directed the Department of Justice to promulgate regulations implementing Title II of the ADA. *See* 42 U.S.C. § 12134(a). By Executive Order 12250, 45 Fed. Reg. 72995 (Nov. 2, 1980), President Carter directed the Department of Justice to issue regulations governing § 504 of the Rehabilitation Act "for the consistent and effective

other, 42 U.S.C. § 12134(b), and courts may not construe the provisions of the ADA "to apply a lesser standard than the standards applied under [the Rehabilitation Act] or the regulations issued by Federal agencies pursuant" to the Rehabilitation Act. *Id.* § 12201(a). *See A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 362 (4th Cir. 2008); *Rogers*, 174 F.3d at 433. "Although the Supreme Court has yet to decide whether the regulations are entitled to the full deference afforded under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984),[15] the Court has counseled that the views expressed by the Department of Justice in the implementing regulations 'warrant respect.'" *Helping Hand*, 515 F.3d at 362 (quoting *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597-98 (1999)).

Despite the general congruence of Title II of the ADA and § 504 of the Rehabilitation Act, there are at least two statutory differences. First, a plaintiff must show a different

---

implementation of various laws prohibiting discriminatory practices in Federal programs and programs receiving Federal financial assistance." The regulations pursuant to Title II of the ADA are found at 28 C.F.R. part 35, and the regulations under the Rehabilitation Act for recipients of federal funding are at 28 C.F.R. part 42, subpart G.

[15] Under the principle of "*Chevron* deference," federal courts defer to "an agency's construction of the statute which it administers," *Chevron*, 467 U.S. at 842, if "Congress has not directly addressed the precise question at issue" with unambiguous statutory language, and the agency's construction is not "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843-44. A court must uphold the agency's construction of such an ambiguous statute, even if the agency's interpretation was not "the only one it permissibly could have adopted," or was not "the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n.11. "In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844.

Not all agency interpretations merit *Chevron* deference, however. Rather, an administrative interpretation "qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead*, 533 U.S. 218, 226-27 (2001). An example of such an interpretation is one promulgated in the course of statutorily-authorized notice-and-comment rulemaking or formal agency adjudication. *See id.* at 229-31.

"causative link between discrimination and adverse action" under the two statutes.  *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999).  Under Title II, a plaintiff need only prove discrimination "by reason of" disability.  42 U.S.C. § 12132.  But, a successful Rehabilitation Act claim requires a showing of discrimination "*solely* by reason of" disability.  29 U.S.C. § 794(a) (emphasis added).  *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 n.17 (4th Cir. 2005) ("[W]e have recognized that the causation standards under Title II of the ADA and § 504 of the Rehabilitation Act are 'significantly dissimilar.'") (quoting *Baird*, 192 F.3d at 469).  In this case, however, no party claims that this distinction is material.

The second significant difference between Title II and the Rehabilitation Act is that, as noted, Title II applies to any "public entity," while § 504 of the Rehabilitation Act applies only to federal agencies or to "any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  Thus, to show a violation of the Rehabilitation Act by a state, local, or private entity, a plaintiff must demonstrate that the "program or activity" at issue receives federal funding.

The ADA and the Rehabilitation Act do not expressly provide for a private right of action.  But, it is well established that private parties may sue to enforce Title II of the ADA and the Rehabilitation Act.  *Barnes v. Gorman*, 536 U.S. 181, 184-85 (2002); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 828 (4th Cir. 1994); *Davis v. Southeastern Community Coll.*, 574 F.2d 1158, 1159 (4th Cir. 1978), *rev'd on other grounds*, 442 U.S. 397 (1979).  *Cf. Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582 (1983) (establishing that Title VI of the Civil Rights Act of 1964 supports a private right of action).

To prevail under an ADA Title II or Rehabilitation Act § 504 claim, "a plaintiff must show that she was excluded from participation in, or denied the benefits of, a program or service offered by a public entity, or subjected to discrimination by that entity." *Constantine*, 411 F.3d at 499 (emphasis omitted). To that end, the Fourth Circuit has recognized "three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *Helping Hand*, 515 F.3d at 362.

Notably, although the Fourth Circuit has held that Title II and the Rehabilitation Act require public entities to make reasonable accommodations for persons with disabilities, *see id.*; *see also Waller ex rel. Estate of Hunt v. City of Danville*, 556 F.3d 171, 174-75 (4th Cir. 2009); *Constantine*, 411 F.3d at 488, the phrase "reasonable accommodation" does not appear in the text of either statute.[16] Rather, the requirement of "reasonable accommodation" in the Title II context derives from the statute's reference to "reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services." 42 U.S.C. § 12131(2). *See, e.g.*, *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1195 n.8 (10th Cir. 2007) ("Title II's use of the term 'reasonable modifications' is essentially equivalent to Title I's use of the term 'reasonable accommodation.'"); *McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards.").

---

[16] In contrast, the definition of "discrimination" that applies to Title I of the ADA expressly includes failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. § 12112(b)(5)(A).

The Justice Department's interpretive regulations further elucidate the requirement of reasonable accommodations. Under 28 C.F.R § 35.130(b)(7), a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." With regard to communication-related disabilities, the regulations require public entities to "take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others," *id.* § 35.160(a), and to "furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity." *Id.* § 35.160(b)(1).

"Auxiliary aids or services" are defined by both statute and regulation. *See* 42 U.S.C. § 12103(1); 28 C.F.R. § 35.104. The regulation, which is more exhaustive, provides:

> *Auxiliary aids and services* includes—
>
> (1) Qualified interpreters, *notetakers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays*, or other effective methods of making aurally delivered materials available to individuals with hearing impairments;
>
> (2) Qualified readers, taped texts . . . or other effective methods of making visually delivered materials available to individuals with visual impairments;
>
> (3) Acquisition or modification of equipment or devices; and
>
> (4) Other similar services and actions.

28 C.F.R. § 35.104 (italics added to show language appearing in the regulation but not in the statute). Notably, "[i]n determining what type of auxiliary aid and service is necessary, a public

entity shall give primary consideration to the requests of the individual with disabilities." *Id.* § 35.160(b)(2).

The regulations interpreting the Rehabilitation Act are also relevant. They require that recipients of federal funding "shall insure that communications with their applicants, employees and beneficiaries are effectively conveyed to those having impaired vision and hearing." *Id.* § 42.503(e). Moreover, a "recipient that employs fifteen or more persons shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program or activities receiving Federal financial assistance." *Id.* § 42.503(f).

Both Title II of the ADA and § 504 of the Rehabilitation Act contemplate *respondeat superior* liability. The Fourth Circuit has said: "Under the ADA and similar statutes, liability may be imposed on a principal for the statutory violations of its agent," rather than only for an official "*policy* of discrimination." *Rosen v. Montgomery County*, 121 F.3d 154, 157 n.3 (4th Cir. 1997) (emphasis in original). *See also T.W. ex rel. Wilson v. School Bd. of Seminole County*, 610 F.3d 588, 604 (11th Cir. 2010) (stating that the ADA "permits an employer to be held liable for the actions of its agents," and assuming, *arguendo*, that the Rehabilitation Act also "permits respondeat superior liability"); *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574-75 (5th Cir. 2002), *cert. denied*, 540 U.S. 810 (2003); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001). Nevertheless, the statutes "cannot be read to impose strict liability on public entities that neither caused plaintiffs to be excluded nor discriminated against them." *Bacon v. City of*

*Richmond*, 475 F.3d 633, 639-40 (4th Cir. 2007) (granting summary judgment in favor of city, where school board, and not the city, was responsible for any ADA violation).

A successful plaintiff in a suit under Title II of the ADA or § 504 of the Rehabilitation Act is generally entitled to a "full panoply" of legal and equitable remedies. *Pandazides*, *supra*, 13 F.3d at 829-32. There are some limits to the availability of relief, however. Punitive damages "may not be awarded in suits brought under [Title II] of the ADA and § 504 of the Rehabilitation Act." *Barnes*, *supra*, 536 U.S. at 189. Moreover, compensatory damages are available only upon proof of intentional discrimination or disparate treatment, rather than mere disparate impact. *Pandazides*, 13 F.3d at 829-30 & n.9. However, "intentional discrimination" and "disparate treatment" in this context are "synonymous," *id.* at 830 n.9; a plaintiff need not show "discriminatory animus" to prevail on a claim for damages under Title II of the ADA or § 504 of the Rehabilitation Act. *Id.*

It does not appear that the Fourth Circuit has specifically addressed whether compensatory damages are available for failure to provide a reasonable accommodation under Title II of the ADA or § 504 of the Rehabilitation Act. However, the majority of circuits that have resolved the question have held that damages may be awarded if a public entity "intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons." *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008). *See Barber ex rel. Barber v. Colorado*, 562 F.3d 1222, 1229 (10th Cir. 2009) (applying "deliberate indifference" standard to reasonable accommodation claim under ADA and § 504); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2008) (applying "deliberate indifference" standard to compensatory damages claim based on allegation that federally-funded

hospital violated § 504 of the Rehabilitation Act in failing to provide ASL interpreter for deaf patient). *See also M.P ex rel. K. v. Indep. School Dist. No. 721*, 439 F.3d 865, 867 (8th Cir. 2006) (applying standard of "bad faith or gross misjudgment" to determine eligibility for compensatory damages under § 504 for failure to reasonably accommodate disability). *But see Delano-Pyle*, *supra*, 302 F.3d at 575 ("There is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the [Rehabilitation Act]" in the Fifth Circuit.); *T.W.*, *supra*, 610 F.3d at 604 (noting that the Eleventh Circuit "has not decided whether to evaluate claims of intentional discrimination under section 504 under a standard of deliberate indifference or a more stringent standard of discriminatory animus.").

Case law in this district endorses the deliberate indifference standard. Writing for this Court in *Proctor v. Prince George's Hospital Center*, 32 F. Supp. 2d 820 (D. Md. 1998), Judge Chasanow held that compensatory damages were available to a deaf plaintiff who brought Title II and § 504 claims against a hospital for its failure to provide ASL interpreters. According to *Proctor*, even if the violations resulted from mere "'thoughtlessness and indifference' rather than because of any intent to deny Plaintiff's rights," the plaintiff was entitled to damages if hospital staff "acted 'knowingly, voluntarily, and deliberately.'" *Id.* at 828 (quoting parties). In reaching her decision, Judge Chasanow adopted the explanation provided by then-District Judge Sonia Sotomayor in *Bartlett v. New York State Board of Law Examiners*, 970 F. Supp. 1094, 1151 (S.D.N.Y. 1997), *aff'd in part, vac'd in part on other grounds*, 156 F.3d 321 (2d Cir. 1998), *vac'd on other grounds*, 527 U.S. 1031 (1999):

> "[T]he question of intent in accommodations cases does not require that plaintiff show that defendants harbored an animus towards her or those disabled such as she. Rather, intentional discrimination is shown by an intentional, or willful, violation of the Act itself. With this understood, it becomes clear, that while

> defendants may have had the best of intentions, and while they may have believed themselves to be within the confines of the law, they nevertheless intentionally violated the ADA and the Rehabilitation Act by willfully withholding from plaintiff the reasonable accommodations to which she was entitled under the law. They had notice of the potential risk of their decision, and clearly refused the accommodation knowingly."

*Proctor*, 32 F. Supp. 2d at 829 (quoting *Bartlett*).

The *Proctor* Court endorsed the proposition that "the level of proof necessary for finding intentional discrimination under [the] Rehabilitation Act means a deliberate indifference to a strong likelihood that a violation of federal rights would result." *Id.* at 829 n.6 (citation omitted). As Judge Chasanow observed, it is "not enough merely to believe that one's actions do not constitute a violation of the law if such a belief represents a 'miscalculation.'" *Id.* at 829 (citation omitted). Where the hospital was "on notice that its failure to provide an accommodation [might] violate the Rehabilitation Act and intentionally opt[ed] to provide a lesser accommodation" by relying "on methods of communication other than a sign language interpreter on numerous occasions," the hospital was liable for compensatory damages. *Id.*

In this case, Paulone's remaining claims pertain to four discrete events: (1) her detention at the Frederick County Adult Detention Center; (2) her initial appearance before Commissioner Riggin; (3) her mandatory attendance at the MADD victim impact panel; and (4) her attempts to enroll in a compulsory alcohol education class. Before addressing each claim, there are two preliminary matters: whether the State or the County is the proper defendant with respect to plaintiff's detention center claims; and the continuing vitality of *Rosen v. Montgomery County*, *supra*, 121 F.3d 154 (4th Cir. 1997), a case that, due to its factual similarity to the case at bar, is relevant to virtually all of plaintiff's claims.

## B. Proper Defendant

The County's banner argument is that the State, and not the County, is liable for any violation of plaintiff's rights by Sheriff's Office personnel managing the Frederick County Adult Detention Center. The State agrees with the County that the State is the proper defendant. However, it asserts that, despite the State's status as the proper nominal defendant, under Maryland law the County would be "responsible for paying any judgment against the State related to the Sheriff's performance of detention center functions." State MSJ at 5 n.4. In contrast, plaintiff contends that the County is the proper defendant (but she notes that, if she is wrong, the State is also a party to the case). Mem. in Support of Pl. Response to Summary Judgment Mot. of Def. Bd. of County Comm'rs ("Pl. Opp. to County MSJ") at 6 (ECF 63-1). The question of which public entity is the proper defendant is a question of law as to which the parties have raised no material disputes of fact.

Under Maryland's Constitution, county sheriffs are constitutional officers. *See* Md. Const., Art. 4, § 44. It is well settled under Maryland law that, as a general rule, county sheriffs and their deputies are "officials and/or employees of the State of Maryland," rather than their county. *Rucker v. Harford County*, 316 Md. 275, 281, 558 A.2d 399, 402 (1989). However, the Maryland Court of Appeals has allowed that, "for some purposes and in some contexts, a sheriff may . . . be treated as a local government employee," such as for issues involving "local funding of sheriff's offices" or a sheriff's entitlement to local government employee benefits. *Id.* at 289, 558 A.2d at 406.

For purposes of civil liability, Maryland courts ordinarily treat sheriffs as state officials. *See, e.g.*, *Barbre v. Pope*, 402 Md. 157, 173, 935 A.2d 699, 709 (2007); *Lee v. Cline*, 384 Md.

245, 265-66, 863 A.2d 297, 309 (2004); *Wolfe v. Anne Arundel County*, 374 Md. 20, 33-34 & n.6, 821 A.2d 52, 60 & n.6 (2003); *Prince George's County v. Aluisi*, 354 Md. 422, 434, 731 A.2d 888, 895 (1999); *Ritchie v. Donnelly*, 324 Md. 344, 357, 597 A.2d 432, 438 (1991); *Boyer v. State*, 323 Md. 558, 572-73, 594 A.2d 121, 128 (1991); *Penhollow v. Bd. of Comm'rs for Cecil County*, 116 Md. App. 265, 296, 695 A.2d 1268, 1284-85 (1997); *State v. Card*, 104 Md. App. 439, 441-47, 656 A.2d 400, 401-04, *cert. denied*, 339 Md. 643, 664 A.2d 886 (1995). Moreover, this Court has consistently taken the view that Maryland sheriffs are State, not county, actors. *See, e.g.*, *Rossignol v. Voorhaar*, 321 F. Supp. 2d 642, 649-51 (D. Md. 2004); *Willey v. Ward*, 197 F. Supp. 2d 384, 387-88 (D. Md. 2002); *see also Lindsey v. Jenkins*, Civ. No. RDB-10-1030, 2011 WL 453475, at *3 (D. Md. Feb. 3, 2011); *Jiggets v. Forever 21*, Civ. No. AW-08-1473, 2010 WL 5148429, at *2 (D. Md. Dec. 13, 2010); *D'Alessandro v. Montgomery County*, Civ. No. PJM-08-2841, 2009 WL 2596479, at *2 (D. Md. Aug. 14, 2009); *Hayat v. Fairely*, Civ. No. WMN-08-3029, 2009 WL 2426011, at *10 (D. Md. Aug. 5, 2009).

In *Dotson v. Chester*, 937 F.2d 920 (4th Cir. 1991), however, the Fourth Circuit upheld liability of a Maryland county for a judgment against a sheriff. *Dotson* involved an action brought under 42 U.S.C. § 1983 by inmates regarding conditions of confinement at the county jail in Dorchester County, Maryland (which, like Frederick County here, is subject to the county commissioner form of government). *Id.* at 921. The suit was resolved by a settlement agreement that, among other provisions, allocated the legal fees and costs incurred by the inmates between the county commissioners of Dorchester County and the county's sheriff. *Id.* at 922. After the sheriff failed to pay his share of the judgment, the inmates sought to garnish the county's bank account to satisfy the sheriff's portion of the judgment. *Id.* This Court ruled that the county was

liable for the sheriff's portion, as well as its own, because the sheriff was "'a policymaker for the county when operating the Dorchester County Jail.'" *Id.* (quoting district court).

On appeal, the Fourth Circuit observed that, under the Supreme Court's decision in *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978), counties (unlike states) can be liable under § 1983, but only for violations that "bear some relation to the county's 'policy or custom.'" *Dotson*, 937 F.2d at 924 (quoting *Monell*, 436 U.S. at 690-91). Therefore, the *Dotson* Court reasoned: "County liability for the Sheriff's operation of the County Jail depends on whether the Sheriff had final policymaking authority for the County over the County Jail." *Dotson*, 937 F.2d at 924. Applying a test articulated by the Supreme Court in *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), the *Dotson* Court explained that the question of who has "final policymaking authority" is a question of state law, although "'state law will [not] always speak with perfect clarity,'" and liability does not necessarily rely "on the technical characterization of an official as a state or county employee." *Dotson*, 937 F.2d at 924 (quoting *Praprotnik*, 485 U.S. at 125).

The *Dotson* Court then embarked on a lengthy survey of Maryland case law. *See Dotson*, 937 F.2d at 925-32. Distinguishing *Rucker* and other "Maryland cases discussing the employment status of the sheriff," the Court reasoned that *Rucker* "does not compel the conclusion that the Sheriff, when managing the County Jail, is a state policymaker." *Id.* at 926. The Court said: "The Sheriff's activities which we investigate—operating the County Jail which houses county prisoners, pursuant to county regulations, and funded by the County—differ from 'the statewide nature' of the Sheriff's duties involved in *Rucker*." *Id.* at 927 (quoting *Rucker*, 316 Md. at 287-88, 558 A.2d at 405). The Court also recognized that "although the Sheriff . . .

now has custody of the County Jail, the County Jail remains a county institution and the County merely has placed final policymaking authority in the Sheriff." *Dotson*, 937 F.2d at 928. It added: "Indeed, from the day the County built the County Jail, the County has been responsible for its conditions and operation." *Id.*

Additionally, the *Dotson* Court observed that, in the wake of *Rucker*, Maryland's General Assembly enacted a statute, codified at Md. Code (2009 Repl. Vol., 2010 Supp.), § 9-108 of the State Finance & Procurement Article ("S.F.P."), which provides that Maryland's counties must either maintain insurance to provide "coverage and defense" of certain tort claims against sheriffs and their deputies or reimburse the State for the cost of the claims. *See Dotson*, 937 F.2d at 927. The statute specifically requires the counties to provide coverage for claims arising from "activities relating to performing law enforcement functions or detention center functions." S.F.P. § 9-108(a)(6). The State has cited S.F.P. § 9-108 for the proposition that, although it is the proper nominal defendant, the County is responsible for payment of any monetary judgment awarded to Paulone. *See also* S.G. §§ 12-405 & 12-501 (specifying procedure for State payment of judgments and settlements against sheriffs concerning "law enforcement functions or detention center functions" from county funds).

Although plaintiff does not cite *Dotson*, she argues that the County is liable for ADA violations at the detention center because "the obligation imposed by Title II of the ADA to ensure effective communication is not a law enforcement issue." Pl. Opp. to County MSJ at 6 (emphasis omitted). She contends that ADA compliance "is an obligation of *all* departments of government, not only law enforcement, just like bookkeeping standards or facility maintenance."

*Id.* (emphasis in original).[17]

While *Dotson* suggests that, in some circumstances, a Maryland sheriff's operation of a county detention center may give rise to county liability under § 1983, *Dotson* is distinguishable from this case in several important respects. First, *Dotson* did not concern identification of the proper nominal defendant in a claim based on county detention center management. Rather, the county sheriff was the defendant in *Dotson*, and the plaintiffs had obtained a judgment against him; the question before the Court was whether they could garnish county funds to satisfy that judgment. Here, the parties appear to agree that the County will ultimately be responsible to pay any judgment based on an ADA violation at the detention center.[18] But, they disagree as to whether the State or the County is the proper defendant, an issue *Dotson* does not address.

Second, and perhaps more important, *Dotson* was a § 1983 case, while this case arises under the ADA and the Rehabilitation Act. There "is no respondeat superior liability under § 1983." *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir.), *cert. denied*, 543 U.S. 813 (2004). A local government entity can only be liable under § 1983 for a violation of federal rights by its employees or agents if the violation arises from a policy of the entity. Therefore, the task of the appellate court in *Dotson* was to determine whether, under the Supreme Court's *Monell* doctrine,

---

[17] Plaintiff cites a Third Circuit case, *Chisolm v. McManimon*, 275 F.3d 315 (3d Cir. 2001), rather than *Dotson*, in support of her position. In *Chisolm*, the appellate court held that a New Jersey county court was not entitled to Eleventh Amendment immunity in an ADA claim for failure to provide interpretive services, because the court served "different functions, judicial and administrative, in different capacities," and the provision of interpretive services was a county responsibility under New Jersey law. *Id.* at 324. Therefore, the *Chisolm* Court reasoned, the county court "was not acting as an 'arm of the state' . . . at the time of the alleged discrimination." *Id.* As *Chisolm* was based on the county court's status under New Jersey law, I do not find it helpful with respect to Maryland institutions.

[18] The County does not contradict the State's assertion that the County will be responsible to pay any money judgment based on an ADA violation at the detention center pursuant to S.F.P. § 9-108.

the county had vested with the sheriff the "final policymaking authority" regarding the county jail. *See Dotson*, 937 F.2d at 924.

In contrast, public entities are liable under principles of *respondeat superior* for their employees' violations of the ADA and Rehabilitation Act. *Rosen, supra*, 121 F.3d at 157 n.3. The Maryland Court of Appeals has made clear that sheriffs and their deputies are employees of the State, and that "counties and municipalities in Maryland are generally not liable under the doctrine of respondeat superior for the tortious acts of State officials or State employees acting in the scope of their employment." *Rucker*, 316 Md. at 292, 558 A.2d at 407. Moreover, Maryland's high court has analyzed S.F.P. § 9-108 and its related statutory provisions, which impose upon counties the ultimate responsibility to pay judgments based on sheriffs' management of county detention centers, and has held that "[t]hese provisions regarding the payment of judgments . . . do not authorize tort actions against counties based on the negligence of State personnel acting within the scope of employment." *Boyer*, *supra*, 323 Md. at 573 n.10, 594 A.2d at 128 n.10. Accordingly, the "final policymaking authority" analysis applied in *Dotson* under § 1983 is inapt in the ADA and Rehabilitation Act context. *See Delano-Pyle*, *supra*, 302 F.3d at 575.

For the foregoing reasons, I conclude that, because the Sheriff and his deputies who operate the detention center are State employees, the State is the proper defendant for plaintiff's claims regarding her treatment at the detention center. It follows that the County is entitled to summary judgment as to plaintiff's ADA claim (Count III) and her Rehabilitation Act claim (Count IV).[19]

---

[19] The County also argues that it is entitled to summary judgment as to plaintiff's

Additionally, the County is entitled to summary judgment as to plaintiff's claim for negligent training and supervision (Count VIII). Under Maryland law, counties enjoy governmental immunity from tort liability with respect to "nonconstitutional torts based on activity categorized as 'governmental.'" *Housing Auth. of Balt. City v. Bennett*, 359 Md. 356, 361, 754 A.2d 367, 370 (2000); *see generally id.* at 358-61, 754 A.2d at 368-70 (discussing history of governmental immunity for local governments under Maryland law). Maryland law does not waive the counties' governmental immunity from tort liability; rather, it requires each county to provide limited indemnity to county employees for non-malicious tortious acts or omissions committed in the employees' scope of employment. *See* C.J. §§ 5-301 *et seq.* (Maryland Local Government Tort Claims Act); *see, e.g., Livesay v. Baltimore County*, 384 Md. 1, 20, 862 A.2d 33, 43 (2004). *See also Martino v. Bell*, 40 F. Supp. 2d 719, 722 (D. Md. 1999); *Dawson v. Prince George's County*, 896 F. Supp. 537, 539 (D. Md. 1995). Thus, any state law tort claim would have to proceed against individual County employees, not the County itself. *See Livesay*, 384 Md. at 20, 862 A.2d at 43. Yet, plaintiff has not named any individual County employee as a defendant.

Moreover, even if the County were not immune, the Fourth Circuit has yet to recognize a cause of action for failure to train under the ADA. Rather, it has opined that, if such liability exists, at a minimum, "the failure to train must have caused some violation" of the ADA. *Waller*

---

Rehabilitation Act claim for the additional reason that Paulone "has neither pleaded nor at any time produced any evidence alleging that any program, service or activity of the County is in receipt of [federal] funds." County MSJ at 18. In response, plaintiff has submitted a page from the Sheriff's Office budget that allegedly shows that the Sheriff receives funding from the federal Department of Homeland Security to house inmates awaiting federal customs and immigration hearings. Pl. Opp. to County MSJ at 9; Ex.6 to Pl. Opp. to County MSJ (ECF 63-7). Because the Court awards judgment in the County's favor on other grounds, it is not necessary to resolve whether plaintiff has adequately supported her allegation of federal funding.

*ex rel. Estate of Hunt v. City of Danville*, 556 F.3d 171, 177 n.3 (4th Cir. 2009). Because the

State, and not the County, is liable for any ADA violation by the Sheriff's personnel, it follows

that the State, and not the County, would be liable for any failure to train.[20] For these reasons,

the Court will also award summary judgment to the County as to Count VIII.

## C. *Rosen v. Montgomery County*

The Court next considers *Rosen v. Montgomery County*, *supra*, 121 F.3d 154 (4th Cir.

1997), a case that is factually similar to this case in many respects, and on which defendants rely

heavily. *Rosen* involved ADA and Rehabilitation Act claims arising out of the DWI arrest of a

deaf motorist. After the motorist failed field sobriety tests and a breath test, he was arrested and

taken to the police station, where he failed a chemical test. *Id.* at 156. Rosen claimed "that the

police made no attempt to communicate in writing and that they ignored his requests for an

interpreter and for a TTY telephone so he could call a lawyer." *Id.* He sought to participate in a

"diversionary program" for first-time DWI offenders in Montgomery County, by which the

offender would enroll in an alcohol education course offered by a variety of private operators.

*Id.* However, he alleged that the county refused to provide an ASL interpreter for the classes,

and did not tell him about a program that offered the classes in a format for hearing-impaired

offenders. *Id.* When Rosen appeared in state court on the DWI charge, he asked the judge to

order the county to provide an interpreter for the education program, but the judge denied the

request. *Id.* Rosen was sentenced to probation before judgment and, as a condition of probation,

was ordered to attend six Alcoholics Anonymous ("AA") meetings, which he did without an

---

[20] As previously noted, plaintiff lodged a claim of failure to train against the State, but that count was dismissed by Judge Quarles because the State has only waived its sovereign immunity from tort claims in State court, not federal court.

interpreter. *Id.* This Court granted summary judgment to the county (the State was not a party), and the Fourth Circuit affirmed. *Id.* at 155.

In the *Rosen* Court's view, the "most obvious problem" with Rosen's claim was that his arrest and the ensuing events were not covered by the ADA and Rehabilitation Act at all. *Id.* at 157. The Court explained: "Rosen clearly has a disability, but calling a drunk driving arrest a 'program or activity' of the County, the 'essential eligibility requirements' of which (in this case) are weaving in traffic and being intoxicated, strikes us as a stretch of the statutory language and of the underlying legislative intent." *Id.* (quoting ADA Title II). In support of that proposition, the Court relied on its earlier case, *Torcasio v. Murray*, 57 F.3d 1340 (4th Cir. 1995), *cert. denied*, 516 U.S. 1071 (1996), in which the Fourth Circuit held that Title II of the ADA and § 504 of the Rehabilitation Act did not apply to state prisons, because "[t]he terms 'eligible' and 'participate' imply voluntariness on the part of an applicant who seeks a benefit from the state; they do not bring to mind prisoners who are being held against their will." *Id.* at 1347 (quoting ADA Title II); *see Rosen*, 121 F.3d at 157 (quoting *Torcasio*).[21]

At first blush, *Rosen* would appear to be dispositive of most, if not all, of plaintiff's claims. However, *Rosen*'s continued vitality is uncertain; one year after that decision, the Supreme Court decided *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206 (1998), in which it invalidated the reasoning of both *Rosen* and *Torcasio*.

---

[21] The terms "eligibility" and "participation" are drawn from Title II's definition of a "qualified individual with a disability," which mean an individual who, with or without reasonable accommodations, "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

In *Yeskey*, a unanimous Supreme Court held that "the plain text of Title II of the ADA unambiguously extends to state prison inmates." *Id.* at 213. The Court expressly rejected the argument that "the words 'eligibility' and 'participation' imply voluntariness on the part of an applicant who seeks a benefit from the State, and thus do not connote prisoners who are being held against their will." *Id.* at 211. The Court explained that "the words do not connote voluntariness," because "[w]hile 'eligible' individuals 'participate' voluntarily in many programs, services, and activities, there are others for which they are 'eligible' in which 'participation' is mandatory." *Id.* As an example, the Court observed: "A drug addict convicted of drug possession . . . might, as part of his sentence, be required to 'participate' in a drug treatment program for which only addicts are 'eligible.'" *Id.*[22]

To my knowledge, the Fourth Circuit has never cited *Rosen* in a subsequent decision. Indeed, in *Waller*, *supra*, 556 F.3d 171, the Fourth Circuit analyzed an ADA claim regarding alleged failure to reasonably accommodate a deaf suspect, without mentioning *Rosen*. The *Waller* Court observed that "courts have recognized" reasonable accommodation claims under Title II of the ADA in "the context of arrests," *id.* at 174, and "assume[d]" the applicability of the reasonable accommodation requirement to arrests. *Id.* at 175. But, the Court stopped short of expressly confirming a reasonable accommodation requirement in the arrest context, concluding that any duty to reasonably accommodate was met in the case before it. *Id.* at 176.[23]

_____

[22] Although the Supreme Court did not expressly mention either *Torcasio* or *Rosen* in its opinion, the Third Circuit's decision in *Yeskey*, which the Supreme Court affirmed, discussed *Torcasio* at length as the "leading case" for the proposition that the ADA and Rehabilitation Act do not apply to state prisons, and concluded that *Torcasio* "disregard[ed] clearly expressed congressional intent." *Yeskey v. Pa. Dept. of Corrections*, 118 F.3d 168, 172-73 (3d Cir. 1997), *aff'd*, 524 U.S. 206 (1998).

[23] In an unreported opinion, another judge of this Court recently relied on *Rosen* (without

Rosen has also been criticized by other courts. *See, e.g.*, *Thompson v. Davis*, 295 F.3d 890, 897 (9th Cir. 2002) (*Rosen*'s "reasoning has now been discredited by the Supreme Court"), *cert. denied*, 538 U.S. 921 (2003); *Calloway v. Boro of Glassboro Dept. of Police*, 89 F. Supp. 2d 543, 556 (D.N.J. 2000) (*Rosen*'s reasoning is "now discredited").  It is also noteworthy that, after *Rosen*, the Fourth Circuit joined other federal circuits in holding that, under the plain language of "the disability discrimination statutes, a plaintiff must show that she was excluded from participation in, or denied the benefits of, a program or service offered by a public entity, *or* subjected to discrimination by that entity." *Constantine*, *supra*, 411 F.3d at 499 (emphasis in original); *see, e.g.*, *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1084-85 (11th Cir. 2007) ("[T]he final clause of [42 U.S.C.] § 12132 protects qualified individuals with a disability from being 'subjected to discrimination by any such entity,' and is not tied directly to the 'services, programs, or activities' of the public entity. . . .  [It] 'is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context.'") (internal citations and some internal quote marks omitted); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) ("Rather than determining whether each function of a city can be characterized as a service, program, or activity for purposes of Title II, . . . we have construed 'the ADA's broad language [as] bring[ing] within its scope "anything a public entity does."'") (citations omitted), *cert. denied*, 539 U.S. 958 (2003); *Regional Economic Cmty. Action Program v. City of*

---

discussing *Yeskey*) in granting summary judgment against a deaf plaintiff on a claim that sheriff's deputies violated the ADA and Rehabilitation Act when they responded to a 911 call regarding suspected domestic abuse and questioned the plaintiff without an interpreter; in that case, however, no arrest was made, unlike the case at bar. *See Seremeth v. Bd. of County Comm'rs of Frederick County*, Civ. No. L-09-0058, 2010 WL 2025551 (D. Md. May 18, 2010). *Seremeth* is currently pending on appeal to the Fourth Circuit. *See Seremeth v. Bd. of County Comm'rs of Frederick County*, No. 10-1711 (4th Cir.) (docket).

*Middletown*, 294 F.3d 35, 45 (2d Cir.) ("The ADA and the Rehabilitation Act . . . prohibit all discrimination based on disability by public entities."), *cert. denied*, 537 U.S. 813 (2002); *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) (finding that "the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does"). Moreover, the Justice Department's interpretive regulations confirm that "title II applies to anything a public entity does." 28 C.F.R. part 35, App. B.

I recognize that *Rosen* has not been expressly overruled and that "arguing that a precedent has been overruled through a court's silence is a disfavored enterprise within this circuit." *In re Morrissey*, 168 F.3d 134, 139-40 (4th Cir.), *cert. denied*, 527 U.S. 1036 (1999). Nevertheless, the weight of subsequent authority, in the Supreme Court as well the Fourth Circuit and other courts, calls into question the reliance on *Rosen* for the broad proposition that the ADA and the Rehabilitation Act are inapplicable to arrests. I will consider the applicability of *Rosen*'s other holdings and *dicta* in the context of the parties' particular claims, to which I now turn.

## D. Detention Center

As noted, the parties dispute the facts with respect to Paulone's detention. Therefore, the Court must identify the parties' factual disagreements and determine whether they are material, which would necessarily prevent entry of summary judgment.

Plaintiff was held at the detention center in the early morning hours of August 1, 2008, from approximately 2:30 a.m. until her appearance before the district court commissioner at around 7:00 a.m. Defendants[24] have submitted an affidavit of Corporal Jason Cave ("Cave

---

[24] The State has incorporated by reference pages 14 through 18 of the County's Motion

Aff."), Ex.D to County MSJ (ECF 51-17), who staffed the Central Booking Unit at the detention center and interacted with plaintiff during that time, as well as affidavits from two other officers who did not interact personally with plaintiff but describe the policies and procedures at the detention center. Plaintiff has described her version of events in deposition testimony.[25]

Corporal Cave was on duty at the detention center from 8:00 p.m. on July 31, 2008, until 8:00 a.m. on August 1, 2008. Cave Aff. ¶ 3. He "assisted in the processing" of Ms. Paulone, "who was booked into the ADC facility at 2:53 a.m. on August 1, 2008." *Id.* ¶ 4. Cave claims that he "immediately acknowledged that Ms. Paulone was hearing-impaired and informed the District Court Commissioner of that circumstance once processing was completed." *Id.* ¶ 5. He also claims that he "communicated with Ms. Paulone by way of written notes of [sic] numerous occasions throughout her detention." *Id.* ¶ 6.[26] According to Cave, "Ms. Paulone had several questions in reference to the detention process and concerning her appearance before the District

---

[25] for Summary Judgment as its argument with respect to the detention center ADA claim. *See* State MSJ at 5. In its motion, the County asserts, *inter alia,* that, under *Rosen*, the ADA and Rehabilitation Act are inapplicable to a post-arrest detention, and thus Paulone "was not entitled to any of the protections of Title II or the Rehabilitation Act in the incident at bar, as a matter of law." County MSJ at 14. However, the State does not incorporate this portion of the County's argument. *See* State MSJ at 5. Therefore, with the exception as to *Rosen*, the Court will refer to the County's briefing and related exhibits as to this issue, despite the dismissal of the claim against the County on other grounds.

[25] Plaintiff apparently gave deposition testimony on two days, July 9 and July 15, 2010. The parties have submitted excerpts from both depositions in various exhibits to their motion papers (ECF 51-23, 52-2, 52-3 & 53-24). The Court will cite the depositions as "Paulone 7/9 Dep." and "Paulone 7/15 Dep.," respectively, and will cite to the transcript page numbers rather than the pagination of the parties' exhibits.

[26] Plaintiff observes that defendants have not produced Cave's alleged notes, although they have produced written notes exchanged between Paulone and Officer McGregor, who arrested her, and Commissioner Riggin. Pl. Opp. to County MSJ at 1-2. She claims that, in response to her discovery requests, the County asserted that Cave's notes "'were not preserved.'" *Id.* (quoting County's response to request for production of documents).

Court Commissioner." *Id.* ¶ 11.  He asserts: "Despite my various other duties, I checked-in on Ms. Paulone, whose cell was visible from my desk, at every opportunity and answered every one of her questions via written notes." *Id.*

Cave also states that he "retrieved an Ultratec Minicom IV T.T.Y. machine from the shift supervisor's office and hooked it up on a staff line in the Central Booking Unit . . . for [plaintiff's] use." *Id.* ¶ 7.  He claims that he "observed Ms. Paulone use the T.T.Y. machine on at least three separate occasions during her detention," but that "Ms. Paulone informed [him] by written note that her roommate, who she was attempting to contact via the T.T.Y., was also deaf, apparently sleeping and unaware that she was calling." *Id.* ¶ 8-9.  Cave asserts: "The T.T.Y. device was working, and I do not recall Ms. Paulone complaining that it was malfunctioning in any way." *Id.* ¶ 10.

Defendants also submitted an affidavit of Lieutenant Timothy Selin, who is the "Commander of Technology" at the FCADC.  Affidavit of Timothy Selin ("Selin Aff.") ¶ 2, Ex.F to County MSJ (ECF 51-19).  Selin states that since "early July 2008" (i.e., less than a month before plaintiff's arrest and detention), the Central Booking Unit at the detention center maintained three TTY devices "for the convenience of the hearing-impaired." *Id.* ¶ 3.  Selin avers that he has "personally operated T.T.Y. devices on several occasions to assist deaf or hearing-impaired detainees," although he does not allege that he was present at the detention center on the night of Paulone's detention. *Id.* ¶ 4.  He claims that the TTYs used at the detention center "become[] operable as soon as [they are] plugged into an electrical socket," and do not "require the use of batteries." *Id.* ¶ 6.

As an attachment to Selin's affidavit, defendants submitted a log of calls to and from the telephone extension to which the TTY was connected on August 1, 2008. Ex.F2 to County MSJ (ECF 51-21). The log shows four outgoing calls to the phone number for Paulone and her housemate, Virginia Borggaard (who is also deaf), at 4:37 a.m., 4:44 a.m., 6:59 a.m., and 7:02 a.m. The duration of each call was less than a minute (the first call was half a minute, the latter three were each nine-tenths of a minute).

As another attachment to Selin's affidavit, the defendants submitted the manual for the Ultratec Minicom IV, the particular model of TTY used at the detention center. *See* Ultratec Manual, Ex.F1 to County MSJ (ECF 51-20). Defendants note that the manual does not indicate that the TTY's batteries need to be charged before the TTY can be used with AC power from a wall outlet. Indeed, they point out that the manual states that the "Minicom IV uses batteries *when you unplug the AC adapter or the power fails*," *id.* at 16 (emphasis added), and also instructs: "All you need to do to set up the Minicom IV is plug it in!" *Id.* at 6.[27]

Finally, defendants submitted an affidavit of Lieutenant Michael Cronise, who is the "Commander of Special Operations" for the Sheriff's Office. In that capacity, he "oversee[s] the intake and processing operations of the Central Booking Unit." Affidavit of Michael Cronise ("Cronise Aff.") ¶ 3, Ex.E to County MSJ (ECF 51-18). Although Cronise was not on duty during Paulone's detention, he describes generally the post-arrest detention procedures of the detention center. According to Cronise, detainees are detained until their initial appearances before a district court commissioner, and the "process of hearing and release is in no way

---

[27] In contrast, Paulone points out that the Ultratec Manual instructs the user to "leave the AC adapter plugged in for 24 hours to charge the batteries" the "first time you set up your Minicom IV," Ultratec Manual at 17, and that a substantial portion of the manual is devoted to instructions for how to care for the batteries.

accelerated by a detainee being able to reach a family member or friend by way of a telephone call from the [FC]ADC." *Id.* ¶ 7. Cronise further avers: "The Sheriff's Office exercises absolutely no control over the District Court Commissioner and has no influence with respect to the order or duration of detainees' appearances before the District Court Commissioner." *Id.* ¶ 8. Moreover, he states that the "average lag time, from initial intake at the ADC to hearing before a District Court Commissioner, is between three and four hours. Delays of five or more hours are not unusual during the night/early morning shifts." *Id.* ¶ 10.

Plaintiff's version of events is significantly different. According to Paulone, she was placed in a cell upon her arrival at the detention center, and "it took hours" until she was able to get the attention of detention center officers, and for them give her a piece of paper, such that she was able to ask to use a TTY. Paulone 7/9 Dep. at 50. Paulone claims, *id.* at 58:

> [I]t wasn't until I had been in the cell for quite some time that, you know, I had been begging for a piece of paper and they must finally [have] realized how else could they communicate with me. And so finally after I was in the cell for some time they finally gave me paper and that's when I was able to . . . again[28] request an interpreter and . . . request access to be able to make a call.

Paulone maintains: "I didn't get that piece of paper until several hours after I was brought in," *id.* at 98, and "after I had made those requests, then they took that paper. They didn't leave it with me. . . ." *Id.* at 58. Paulone's written communication was also hindered by the fact that she required reading glasses, which were in her purse when she was arrested. *Id.* at 36-37. They were not returned to her until she was released from the detention center after her appearance before the district court commissioner. *Id.*

---

[28] Paulone testified that she initially requested an interpreter when she was brought to the City of Frederick Police station. *See* Paulone 7/9 Dep. at 37 & 41.

With respect to the TTY, Paulone recalls: "[When] they finally opened up the cell . . . we went looking for a TTY." *Id.* at 50. She states: "There wasn't one set up anywhere in the station but one of the officers apparently finally remembered that it was in a drawer somewhere . . . . It was still in the box. But we weren't able to get it set up so that it would work." *Id.*[29]

According to Paulone, "typically when a TTY hasn't been used before it requires up to eight hours of being plugged in to actually charge the battery within the TTY." *Id.* at 61. She acknowledges that she is "not a technological wizard, generally speaking," *id.*, and does not "totally understand how a TTY works," *id.* at 63, but she claims that she has "many, many years [of] experience of using TTYs." *Id.* at 61. Paulone states that, "upon opening the box, [she] immediately realized that [the TTY] wasn't charged enough," *id.* at 59, and the "machine was completely unresponsive." *Id.* at 67. She recalls that she plugged the TTY into a power outlet and was taken back to her cell. *Id.* After "two or three hours," she believed the TTY would have "had enough time to charge," and detention center officers again removed her from her cell so that she could use the TTY. *Id.* But, she discovered that "the TTY had been unplugged." *Id.* Nevertheless, Paulone attempted, without success, to use the TTY to call her housemate, Borggaard.

Paulone claims that she "came back to the TTY at least three times to attempt the call because they had unplugged it and so I plugged it back in to get more charge in the TTY but . . . it was during a short amount of time." Paulone 7/9 Dep. at 63. It appeared to Paulone that the TTY "still didn't have enough juice in the battery." *Id.* at 66. She believes that Borggaard "received the call but not . . . my responses or that there wasn't enough power for me to see that

---

[29] Paulone also testified that she requested a videophone, but the detention center personnel "didn't seem to understand what that technology was." Paulone 7/9 Dep. at 50-51.

she was responding . . . and then be able to respond myself." *Id.* at 63.  Paulone denies Cave's

assertion that she wrote him a note suggesting that Borggaard was likely asleep. *Id.* at 60.

In Borggaard's affidavit, submitted by Paulone, Borggaard asserts that she was awakened

at around 4:00 a.m. on August 1, 2008, by a "house light alerting system" that sends "a signal to

all lamps when the phone or doorbell ring."  Affidavit of Virginia Borggaard ("Borggaard Aff.")

at 1, Ex.7 to Pl. MSJ (ECF 52-11).  The bedroom lamp alerted Borggaard to an incoming call,

which Borggaard attempted to answer via her TTY.  *Id.*  Borggaard recounts, *id.*:

> There was no response to the typed greeting, but I could tell from the
> TTY's blinking status light that there was movement at the other end, indicating
> some difficulty in responding.  I hung up, and very shortly afterwards, received a
> second light alert to again answer the TTY.  A response was sent, again with no
> answer.  The status light still showed movement on the other end.  After hanging
> up, a third call came thru [sic], with the same repeated patterns.  I knew it was
> Joette trying to reach me, because the foyer lamp was still on at that hour,
> indicating she had not yet come home.

Borggaard provided plaintiff with her "TTY tape," which is a log of activity on

Borggaard's TTY, similar in appearance to an adding machine tape.  *See* TTY Tape, Ex.N to

Mem. in Opp. to Pl. Mot. for Summ. J. ("County Opp.") (ECF 61-2).  It shows three successive

calls, dated August 2, 2008,[30] at 4:23 a.m., 4:26 a.m., and 4:28 a.m, respectively.  In each call,

the only recorded text is the repeated phrase "HELLO THIS IS JINI,"[31] and variations thereof.

The TTY tape does not indicate the phone number of the caller.

---

[30] The following notation is handwritten on the TTY tape: "Actually should read 8/1/08."
(Underlining in original).   In her deposition, Paulone testified that she recognized the
handwriting as Borggaard's.  Paulone 7/9 Dep. at 64.  Notably, there is no dispute that Paulone
was detained in the early hours of August 1, not August 2, 2008.  When questioned as to the
discrepancy in the dates on the TTY tape, Paulone stated: "There's something wrong with
[Borggaard's TTY] machine. . . .  The paper printout date is wrong."  Paulone 7/9 Dep. at 65.
Paulone could not further explain the discrepancy, stating: "[W]e'd have to ask [Borggaard]
'cause it's her TTY.  She's more familiar with it."  *Id.*

[31] Paulone testified that Jini is Borggaard's nickname.  Paulone 7/9 Dep. at 62.

It is also pertinent that, as the parties agree, the detention center is subject to a contract between the County and Maryland Interpreting Services, Inc. (d/b/a "WeInterpret") for the provision of ASL interpreting services. *See* "County of Frederick Contract Services Agreement for Interpreting Services for the Deaf and Hard of Hearing" ("Contract"), Ex.G to County MSJ (ECF 51-22). Under the Contract, WeInterpret provides ASL interpreters in a variety of circumstances, including: "Incidents handled by the Sheriff's Office, including situations involving a witness to an incident or a potential suspect of a crime"; "Emergency situations"; "Citizen communication with County departments and agencies"; and "Citizen participation in County programs and services." Contract, Exhibit A, § 8.1. The Contract anticipates availability of WeInterpret on a "[t]wenty-four (24) hour seven (7) days per week" basis, *id.* § 8.7, and provides that the "request for services could be at any time of the day or night and could occur on any day of the week." *Id.* § 8.8. The contract sets a premium rate for interpreting services provided "[a]t site immediately, no more than 1 hour from request," of $175 per hour, with a two-hour minimum. Contract, Exhibit C, Items #2-3.

Moreover, the Sheriff's Office has a "General Order" dated May 1, 2006, setting Sheriff's Office policy for "Communicating with Deaf or Hearing Impaired Persons." Ex.L to County MSJ (ECF 51-27). The General Order recognizes that the "Sheriff's Office has, and will comply with, specific legal obligations under the Americans with Disabilities Act and the Rehabilitation Act." *Id.* at 1. Moreover, it sets forth a list of "auxiliary aids" to be used "when available, to communicate effectively," *id.* at 3, as follows:

1. Use of gestures,
2. Use of visual aids,
3. Exchange of written notes,
4. Use of computers or typewriters,

5. Use of assistive listening devices,
6. Use of teletypewriters (TTY's), and
7. Use of qualified oral or sign language interpreters.

The General Order also provides: "The type of aid that will be required for effective communication will depend on the individual's usual method of communication, and the nature, importance, and duration of the communication at issue." *Id.* at 2. Further, it states that "primary consideration should be given to the communication aid or service that works best for [a given] person." *Id.* It also requires deputies to "ask persons who are deaf or hard of hearing what type of auxiliary aid or service they need," and to "defer to those expressed choices, unless there is another equally effective way of communicating, given the circumstances, length, complexity, and importance of the communication, as well as the communication skills of the person who is deaf or hard of hearing." *Id.* According to the General Order, "[i]n many circumstances, oral communication supplemented by gestures and visual aids, an exchange of written notes, use of a computer or typewriter, or use of an assistive listening device may be effective." *Id.* However, it recognizes that, in other circumstances, ASL interpreters "are needed to communicate effectively." *Id.* The General Order indicates that, the "more lengthy, complex, and important the communication, the more likely it is that a qualified interpreter will be required for effective communication. . . ." *Id.* By way of example, it suggests that written notes may be sufficient if "a person is asking a deputy for directions to a location," but an interpreter may be necessary if "there has been an incident and the deputy is conducting witness interviews." *Id.*

The General Order also states that the "P.I.S.[32] maintains a list of sign language and oral

---

[32] The acronym "P.I.S." is not defined in the General Order, and the parties have not

interpreting service(s) that are available (on-call 24 hours per day)." *Id.* at 4. The parties do not indicate whether this list of interpreters is separate from the County's contract with WeInterpret. In any event, the parties agree that, despite the County's Contract and the provisions of the Sheriff's General Order, an ASL interpreter was not provided to Paulone during her detention.

Defendants claim that they are entitled to summary judgment with respect to the events at the detention center because, even in the light most favorable to plaintiff, she "was simply not 'discriminated against' merely because she could not follow everything that Detention Center personnel were saying or communicate as clearly as she would wish." County MSJ at 14 (quoting *Rosen*, 121 F.3d at 158). They argue: "In this case the Sheriff's Office personnel monitoring Plaintiff's detention did not, as a matter of undisputed fact, discriminate against Plaintiff on the basis of her disability, but rather they gave her special treatment in light of it." County MSJ at 15.

Defendants note that the Sheriff's Office policy provides for three accommodations for hearing impaired prisoners: "1) use of written notes; 2) an open contract with a local interpreting service; and 3) the availability of state-of-the-art auxiliary telecommunications aids." *Id.* As to the use of written notes, defendants maintain that Corporal Cave was "in frequent written communication with Plaintiff throughout her detention." *Id.* With respect to an ASL interpreter, defendants acknowledge that, despite the Sheriff's Office's contract with Maryland Interpreting Services, an interpreter was not provided to plaintiff. However, they claim that the fact that "the Detention Center did not have an ASL interpreter on hand is, from Plaintiff's perspective, arguably unfortunate but that one could not be located and summoned in the middle of the night

explained its meaning to the Court.

is neither surprising nor evidence of discrimination under Title II." *Id.* at 15-16. Finally, defendants claim that plaintiff's assertion that the TTY "was defective for want of sufficient battery charge . . . is speculation at best and, on the summary judgment record, demonstrably incorrect." *Id.* Defendants point to Lieutenant Selin's assertions and the manual for the Ultratec Minicom IV TTY, claiming that the particular model of TTY used at the detention center does not require the use of batteries when it is receiving a direct electrical current from a wall socket. *Id.* at 17. They also rely on the call records showing calls from the detention center to plaintiff's home phone number on the night of plaintiff's arrest. *Id.* "Under these facts," defendants assert, "Plaintiff's failure to reach anyone . . . is due purely to the fact that the only person she attempted to call was her deaf roommate in the middle of the night. No failure of the Detention Center staff or equipment is implicated." *Id.*

But, even if detention center personnel failed to provide accommodations to plaintiff, defendants insist that they are still entitled to judgment because "neither an ASL interpreter nor a perfectly functioning T.T.Y. would have made the slightest impact on accelerating Plaintiff's release, as neither would have expedited her bond hearing before the Commissioner." *Id.* Relying on *Rosen*, defendants claim that plaintiff "cannot assert, and certainly cannot prove, 'that better communication would have changed things one iota, and, in the end, [s]he is forced to fall back on [her] claim that [s]he was "humiliated and embarrassed."'" *Id.* (quoting *Rosen*, 121 F.3d at 158; defendants' alterations). In sum, defendants claim that "the alleged discrimination caused no real injury." County MSJ at 17.

In contrast, plaintiff maintains that she is entitled to summary judgment with respect to her detention center claim, because "the FDADC failed to accommodate her disability." Pl. MSJ

at 10. Noting that it is undisputed that the detention center staff were aware of her disability when she arrived at the detention center, Paulone contends that the facts "support a claim of intentional discrimination," because she "was never provided an interpreter"; she "was not provided a functional TTY device"; and her "request for paper and pen were ignored for hours." *Id.* at 10-11.

As to the lack of an interpreter, Paulone notes that the contract with Maryland Interpreting Services provides for an interpreter to arrive within an hour in emergency situations. *Id.* at 10. Nevertheless, she points out that defendants raise "no contention that the corrections officers [in contrast to the district court commissioner, discussed *infra*] ever attempted to secure interpreting services at any time during Ms. Paulone's detention." *Id.* Regarding the TTY, Paulone suggests that, by making a TTY available to her, the detention staff implicitly recognized her need for a reasonable accommodation. Pl. MSJ at 11. But, she argues that the TTY was not functional because the batteries were not charged. According to Paulone, "simply having a TTY stashed away somewhere does not fulfill the public entity's obligation to ensure effective communication." Pl. MSJ at 7. In her view, keeping a TTY "in its original packaging," Pl. MSJ at 8, without a charge, fails to satisfy the requirement of reasonable accommodation. As she puts it: "An inaccessible accommodation is no accommodation at all." *Id.* at 9. She cites the ADA regulations, which require public entities to "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities." 28 C.F.R. § 35.133. Paulone also "denies that anyone communicated with her in writing until several hours after she arrived at the FCADC." *Id.*

Accordingly, Paulone maintains that the facts establish the detention center personnel's deliberate indifference to her rights under the ADA, thus meeting the standard of intentional discrimination and entitling her to damages. *Id.* at 11. She contends that, by failing to maintain the TTY in operable condition and by "ignor[ing] Ms. Paulone's repeated requests for communication access accommodations," the detention center staff displayed "deliberate indifference to her rights as secured by the ADA, and thus intentional discrimination based on her deafness." *Id.* at 12.

Plainly, the facts with respect to the detention center claim are hotly contested. As indicated, plaintiff claims that the detention center officers did not establish communication with her, even via paper and pen, for several hours, and that the TTY device was inoperable.[33] In contrast, defendants assert that Corporal Cave responded to every request plaintiff made, that the TTY was operable, and that plaintiff was unable to reach Borggaard by using the TTY only because Borggaard was asleep at the time in question. These disputes cannot be resolved at the summary judgment stage.[34]

Given that the parties agree that the officers were aware throughout Paulone's detention that she was deaf, and that Sheriff's Office policy calls for reasonable accommodations to be made for deaf detainees, Paulone's allegations that the detention center personnel refused to

---

[33] The Ultratec Manual appears to support the proposition that the TTY's battery does not need to be charged before use if the TTY is connected to a power outlet. However, Paulone's testimony is unequivocal that the TTY did not work. Even if the basis for her belief as to the *reason* that the TTY did not work is faulty, the Court, in the posture of the case, cannot credit defendants' assertion that the TTY was fully operable.

[34] Plaintiff asks the Court to strike the affidavits of Corporal Cave and Lieutenant Selin because they contradict Paulone's deposition testimony. Defendants' evidence is not subject to being struck simply because it contradicts plaintiff. Rather, the contradiction establishes a dispute of fact that, if material, must be resolved by the fact finder.

communicate with her for hours, taken in the light most favorable to her (as they must be in considering the State's motion for summary judgment), are sufficient to state a claim of deliberate indifference to Paulone's right to reasonable accommodation under the ADA. *See Proctor*, *supra*, 32 F. Supp. 2d at 829 (stating that deliberate indifference standard for failure to provide reasonable accommodations requires that defendants "'had notice of the potential risk of their decision, and clearly refused the accommodation knowingly'") (citation omitted).

On the other hand, when the alleged facts are taken in the light most favorable to the State, Paulone is not entitled to summary judgment. In the State's version of events, Paulone was provided with written communication throughout her detention, and afforded multiple opportunities to use a working TTY. This cannot support a determination that, as a matter of law, the State violated the ADA.[35]

Even assuming that reasonable accommodations were not provided to Paulone, defendants argue that the State is entitled to summary judgment. Relying on *Rosen*, defendants claim that "the alleged discrimination caused no real injury" to Paulone. County MSJ at 17.

_____

[35] To be sure, the parties agree that Paulone was never provided an ASL interpreter at the detention center. However, as discussed in more detail, *infra,* with respect to plaintiff's appearance before the district court commissioner, the ADA does not require an ASL interpreter in all circumstances; under some circumstances, written communication on a notepad may be a sufficient reasonable accommodation. Whether an accommodation is reasonable under the circumstances is ordinarily a question of fact. *Pandazides*, *supra*, 13 F.3d at 833.

In my view, it is not clear that the communications between Paulone and the officers during her detention were substantial or complex enough that an ASL interpreter was required as a matter of law. Determination of whether an ASL interpreter was necessary at the detention center will benefit from further factual development at trial, and therefore I decline to award summary judgment to Paulone on this basis. *See generally Andrew v. Clark*, 561 F.3d 261, 271 (4th Cir. 2009) (observing that district courts have discretion to deny summary judgment, even where grant of summary judgment might be appropriate on the record so far made in the case).

As noted, when confronted with similar facts, the Fourth Circuit in *Rosen* opined that the "most obvious problem" with a deaf motorist's claim of an ADA violation in the context of arrest and post-arrest detention was that, in the *Rosen* Court's view, the ADA did not apply to arrest and detention at all. *Rosen*, 121 F.3d at 157-58. For the reasons explained, *supra*, this Court is doubtful that *Rosen* remains good law for that proposition. However, that proposition was not the sole foundation for the *Rosen* Court's decision.

The *Rosen* Court proceeded to "assume . . . that the police were required to provide auxiliary aids at some point in the process" after "the arrival at the stationhouse." *Id.* at 158. Nevertheless, the Court affirmed the district court's grant of summary judgment against Rosen on his ADA claim, "based on an even more fundamental infirmity: the lack of any discernible injury." *Id.* The Court explained, *id.* (emphasis in original):

> What the policemen *should have* done is beside the point, unless Rosen can show that he was somehow damaged by their failure to communicate. Rosen does not assert that better communication would have changed events one iota, and, in the end, he is forced to fall back on his claim that he was "humiliated and embarrassed." But these are emotions experienced by almost every person stopped and arrested for drunk driving. Rosen, who is a lawyer, failed a field test, signed a form, failed another test, was arrested, signed another form, and failed another test. Without some better indication of precisely what it was that he did not understand, we cannot find an injury that would suffice to invoke the ADA's protections.

Defendants contend that the foregoing passage from *Rosen* stands for the proposition that, in order to survive summary judgment on an ADA claim, a plaintiff must demonstrate some form of actual injury, over and above the denial of reasonable accommodations or disparate treatment that the ADA prohibits. They argue that plaintiff has not shown any such injury, other

than humiliation and embarrassment, which they claim *Rosen* rejects as a basis for ADA liability.[36]

The *Rosen* Court did not cite any authority for the proposition that a plaintiff must be "damaged by [defendants'] failure to communicate" in order to "invoke the ADA's protections."[37]  To be sure, it is clear that a civil rights plaintiff ordinarily must prove an actual injury in order to recover compensatory damages.  Compensatory damages are, by their nature, "grounded in determinations of plaintiffs' actual losses."  *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986); *see also Carey v. Piphus*, 435 U.S. 247, 254-59 (1978). "Where no injury [is] present, no 'compensatory' damages [can] be awarded."  *Stachura*, 477 U.S. at 308.

In *Stachura*, the Supreme Court held that "damages based on the abstract 'value' or 'importance'" of civil rights "are not a permissible element of compensatory damages."  *Id.* at 310.  *See also Gregory v. Otac, Inc.*, 247 F. Supp. 2d 764, 769-70 (D. Md. 2003) ("The mere violation of the ADA does not alone establish injury.  A plaintiff is obligated to show, by

---

[36] It may be that the *Rosen* Court meant that the plaintiff could not recover where his only injuries were the same "emotions experienced by almost every person stopped and arrested for drunk driving," regardless of disability.  *Rosen*, 121 F.3d at 158; *see also Waller*, *supra*, 556 F.3d at 174 (stating that "courts have recognized" claims under Title II of the ADA for failure "to reasonably accommodate [an arrestee's] disability during the investigation or arrest, *causing him to suffer greater injury or indignity than other arrestees*") (emphasis added).  If so, this case is distinguishable from *Rosen*.  At her deposition, Paulone asserted that when the officers refused to communicate with her, even via pen and paper, she "just started crying 'cause here I am stuck in this situation.  I can't communicate.  They won't communicate with me.  And I'm just stuck here."  Paulone 7/9 Dep. at 54.  These emotions stemmed directly from the officers' alleged failure to communicate with Paulone, not from the embarrassment of her DWI arrest.  Thus, she alleges an injury distinct from the humiliation and embarrassment "experienced by almost every person" without a disability who is arrested for drunk driving.  *Rosen*, 121 F.3d at 158.

[37] As noted, to my knowledge, the Fourth Circuit has not cited *Rosen* for this or any other proposition.

competent evidence, that a defendant's violation of the ADA caused him actual injury before such plaintiff can recover.") (citations omitted); *Levy v. Mote*, 104 F. Supp. 2d 538, 544 (D. Md. 2000) (same). Nevertheless, the Fourth Circuit has held that, "in a case in which a plaintiff's civil rights are found to have been violated, it is appropriate to award nominal damages," even if injuries sufficient to support a compensatory damage award are not present. *Park v. Shiflett*, 250 F.3d 843, 854 (4th Cir. 2001) (citing *Carey*, *supra*, 435 U.S. 247). Ordinarily, the availability of nominal damages "suffice[s] to defeat an entry of summary judgment." *Arebaugh v. Dalton*, 730 F.2d 970, 972 (4th Cir. 1984).

Although the Fourth Circuit has not specifically considered whether nominal damages are available in a claim under the ADA, at least one other circuit has held that nominal damages are available under that statute. *See, e.g.*, *Flowers v. S. Regional Physician Servs., Inc.*, 247 F.3d 229, 239 (5th Cir. 2001) (remanding for entry of award of nominal damages where plaintiff demonstrated ADA violation but no compensable "injury stemming from the harassment"). *See also Tolbert v. Queens College*, 242 F.3d 58, 74 (2d Cir. 2001) (holding, in Title VI discrimination suit, that "a plaintiff who has proven a civil rights violation, but has not proven actual compensable injury, is entitled as a matter of law to an award of nominal damages," and "the defendant who committed the violation is not entitled to judgment as a matter of law").[38]

_____

[38] To be sure, the emotional injury alleged by plaintiff is minimal, and, without more, would not entitle Paulone to more than nominal damages. *See Carey*, 435 U.S. at 264 & n.20 (holding that "mental and emotional distress caused by the denial" of civil rights "itself is compensable," provided that there is "proof that such injury actually was caused," which is "evidenced by one's conduct and observed by others"). *See also Price v. City of Charlotte*, 93 F.3d 1241, 1254 (4th Cir. 1996) (holding that "a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress based on a constitutional violation; however, the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the

Moreover, other circuits have recognized that the discrimination prohibited by the ADA is an injury in itself, and have rejected a requirement that a plaintiff show a further injury beyond the discrimination as a predicate to *liability* (as opposed to eligibility for compensatory damages).  For instance, in *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185 (10th Cir. 2007), involving an ADA claim by a deaf arrestee concerning the defendants' failure to provide an auxiliary aid at the arrestee's post-arrest probable cause hearing, the Tenth Circuit reversed entry of summary judgment in favor of public entity defendants.  The *Robertson* Court rejected the argument that "the charges against Mr. Robertson were dismissed, and therefore, Mr. Robertson was not injured as a result of any lack of accommodation."  *Id.* at 1199.  It reasoned that "the defendants take too narrow a view of Mr. Robertson's 'injury.'  Though the charges against Mr. Robertson were dismissed, he was denied the ability to participate in his probable cause hearing to the same extent as non-disabled individuals."  *Id.*

Similarly, in *Camarillo v. Carrols Corp.*, 518 F.3d 153 (2d Cir. 2008), the Second Circuit reversed a district court's grant of summary judgment in favor of a restaurant on a vision-impaired patron's ADA claim regarding the restaurant's inaccessible menus.  The district court had agreed with the restaurant that "on every occasion [the plaintiff] 'was permitted to eat,'" and therefore she had not alleged "facts to show injury under the ADA."  *Id.* at 155 (quoting district court).  The appellate court held that the plaintiff had "alleged past injury under the ADA (namely, defendants' discriminatory failure to ensure effective communication of their menu items)."  *Id.* at 158.  *See also Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1069 (9th Cir. 2009)

plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages"; and articulating factors to "aid triers of fact in determining the propriety of awarding compensatory damages for emotional distress"), *cert. denied*, 520 U.S. 1116 (1997).

(Gould, J., concurring) (stating that the ADA does "not expressly require a showing of injury or adverse effect *from* the discrimination" to establish liability) (emphasis added); *Armstrong v. Davis*, 275 F.3d 849, 865 (9th Cir. 2001) (holding that parole board's "failure to make accommodations that would enable [disabled prisoners and parolees] to attend or comprehend parole and parole revocation hearings . . . in itself, constitutes 'actual injury'" under the ADA and Rehabilitation Act), *cert. denied*, 537 U.S. 812 (2002).

It would seem that, in referring to Rosen's failure to demonstrate an injury (beyond his conclusory assertions of humiliation and embarrassment), the *Rosen* Court meant that Rosen could not establish any entitlement to recover compensatory damages.[39] But, it is not likely that the Fourth Circuit intended to depart, *sub silentio*, from its holdings in *Park* and *Arebaugh* regarding nominal damages. Even assuming, *arguendo*, that the *Rosen* Court intended to endorse a requirement that, in the ADA context, a plaintiff must demonstrate injury as a predicate to liability, the Fourth Circuit's more recent case law casts doubt on that proposition.

---

[39] It is well established that, "[u]nder the ADA, compensatory damages are available for . . . 'emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.'" *Fox v. Gen'l Motors Corp.*, 247 F.3d 169, 179-80 (4th Cir. 2001) (quoting 42 U.S.C. § 1981a(b)(3)); *see also Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 304 (4th Cir. 1998); *see also Pandazides*, *supra*, 13 F.3d at 830 (overruling the prior holding of *Eastman v. Va. Polytechnic Inst. & State Univ.*, 939 F.2d 204, 209 (4th Cir. 1991), that "§ 504 of the Rehabilitation Act does not permit an award of compensatory damages for pain and suffering"). Indeed, courts have affirmed compensatory damages for emotional harms arising from violations of the ADA, where the claim of emotional injury has a proper evidentiary foundation. *See, e.g.*, *Giles v. Gen'l Elec. Co.*, 245 F.3d 474 (5th Cir. 2001) (stating that damages are available for emotional injury under ADA, but reducing $300,000 award for "emotional distress" to $150,000); *Riemer v. Ill. Dept. of Transp.*, 148 F.3d 800, 808-09 & n.11 (7th Cir. 1998) (affirming award of damages for emotional pain and mental anguish in ADA action); *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285-86 (7th Cir. 1995) (same); *see also Flowers*, *supra*, 247 F.2d at 238-39 (stating that damages are available for emotional injury under ADA, but reversing award of compensatory damages, and remanding for entry of award of nominal damages, where plaintiff presented no evidence of actual emotional injury).

In *Feldman v. Pro Football, Inc.*, No. 09-1021 (4th Cir. Mar. 25, 2011) (unreported), the Fourth Circuit affirmed a grant of summary judgment in favor of deaf plaintiffs, holding that the ADA required the defendants to provide captioning of the lyrics of popular music played over the public address system at a stadium during professional football games. *Feldman* was decided in the context of public accommodations (ADA Title III), rather than public entities (ADA Title II). Nevertheless, in affirming the district court, the *Feldman* Court did not discuss an actual injury to the plaintiffs, separate and apart from the defendants' refusal to provide a reasonable accommodation. *See Feldman*, slip op. at 21-28.

Plaintiff's allegations with respect to injury are scant. But, plaintiff has produced evidence that Sheriff's Office personnel denied her a reasonable accommodation with deliberate indifference, and defendants have produced evidence to the contrary. Given the lack of clarity as to whether *Rosen* permits summary judgment on the ground that a plaintiff has not demonstrated injury stemming from the denial of a reasonable accommodation, the Court will exercise its discretion "to deny summary judgment motions even when the standard [might] appear[] to have been met." *Andrew v. Clark*, *supra*, 561 F.3d at 271; *see also Forest Hills Early Learning Ctr., Inc. v. Lukhard*, 728 F.2d 230, 245 (4th Cir. 1984) ("Even where summary judgment is appropriate on the record so far made in a case, a court may properly decline, for a variety of reasons, to grant it.").[40] Accordingly, the Court will deny summary judgment to both Paulone and the State with respect to Paulone's treatment by detention center officers.

_____

[40] Although plaintiff certainly has had the opportunity to respond to defendants' claim that she has not demonstrated an injury, the Court is also cognizant that the bulk of the parties' discussion in their motions papers has focused on the issue of liability, rather than extent of damages.

### E.  District Court Commissioner

The parties do not dispute the relevant facts with respect to Paulone's initial appearance before Maryanne Riggin, the district court commissioner.  They are drawn from an affidavit of Riggin; plaintiff's deposition testimony; and various documentary exhibits, including the handwritten notes exchanged between Riggin and Paulone during the initial appearance. However, the parties dispute whether it can be inferred from the underlying facts that Riggin achieved effective communication with Paulone.

As noted, under Maryland Rule 4-212(f)(1), "[w]hen a defendant is arrested without a warrant," as in this case, the defendant must be presented for an initial appearance before a judicial officer (*i.e.*, a judge or a district court commissioner) "without unnecessary delay and in no event later than 24 hours after arrest."  Maryland law requires that, in each of its counties, one or more commissioners shall be available "at all times," *id.* § 2-607(c)(3), including times when the courts are not open.  In Maryland, district court commissioners are empowered to "receive applications and determine probable cause for the issuance of charging documents"; to "advise arrested persons of their constitutional rights"; and to "set bond or commit persons to jail in default of bond or release them on personal recognizance if circumstances warrant[.]"  C.J. § 2-607(c)(1)-(2).

At the initial appearance, the judicial officer must inform the criminal defendant of the charges, including the allowable and/or mandatory penalties, and must provide the defendant with a copy of the charging document.  Md. Rule 4-213(a)(1).  The judicial officer must also ensure that the defendant reads a notice regarding the right to counsel, or must read the notice to the defendant if the defendant is "unable for any reason to do so."  Md. Rule 4-213(a)(2); *see*

*also* Md. Rule 4-202(a) (mandating language of notice of right to counsel). Moreover, the judicial officer must advise the defendant of the risks of appearing for trial without counsel. Md. Rule 4-213(a)(2).

In her affidavit, Riggin recounts that she "came on duty" at the detention center at approximately 6:00 a.m. on August 1, 2008. Riggin Aff. ¶ 3. Further, she avers, *id.*:

> I believe, although I am not 100% sure, that the midnight Commissioner (John Nolte) advised me when I came on duty that there was a deaf detainee in the Detention Center who had requested the services of an interpreter. I believe that Mr. Nolte told me that he had been trying to find an interpreter to come to the Commissioner's Office since the time he had been advised, prior to my arrival, that an interpreter was needed, but he was unable to locate anyone to come. My belief in this regard is based upon the normal process and procedures in my office. I, and the other Commissioners, know that it often takes an hour or two, and sometimes more, from the time of a request for an interpreter to come to the Commissioner's Office, and we try to start the process of finding an interpreter as early as possible to account for the anticipated lag time. In addition, the normal procedure is for the Commissioner who is going off duty to advise the Commissioner who is coming on duty about such things as attempts to find an interpreter.

Riggin continues, *id.* ¶ 4:

> When I came on duty . . . I continued what I believed were Commissioner Nolte's efforts to find an interpreter. I was unable to find one who could come to the office. Consequently, when I saw Joette Paulone, the deaf detainee, an hour or so after I came on duty, I communicated with her by way of written notes passed back and forth between us . . . . I told her that I had been unable to find an interpreter, and asked her whether she wanted to proceed with the process or wait until I could find an interpreter. She advised me that she did not want to wait any longer, and consequently the appearance process continued and was completed by way of written notes passed back and forth between us.

According to Paulone, Riggin "was a very pleasant lady, but the first thing I did was grab a piece of paper and ask for an interpreter because she starts handing me all this stuff, it's all these legal documents with all this legalese on it. I don't have my glasses. I can't read it. I can't understand it." Paulone 7/9 Dep. at 74. Claiming that she "needed an interpreter at that point,"

*id.,* Paulone explains: "[W]hen I asked for the interpreter they[41] told me that I wasn't going to get one at first and then they, [sic] I didn't want to sign any of the documents because I couldn't read them.  I didn't understand them or anything like that."  *Id.*  Paulone adds that, when she asked Commissioner Riggin for an interpreter, "to her credit, [Riggin] was at least acknowledging the fact that [Paulone] couldn't understand the documents."  *Id.* at 85.  Paulone reiterates that she "wasn't able to understand what was going on."  *Id.*

Paulone explains that she "can write in some English" but her "grammar is not the best.  It winds up looking like broken English."  *Id.*  She adds that she does not "read and write English in that way to be able to have an extended back-and-forth conversation," and that she "certainly can't write for extended periods of time and understand and be clear about what's going on."  *Id.*

As noted, the parties have submitted the written notes exchanged between Riggin and Paulone, the content of which is set forth below.  Ex.2A to State MSJ (ECF 53-4).

[Riggin:] I called every interpreter listed.   None are available.   Are you comfortable with notes?

[Paulone:] depend on [sic] but I prefer an interpreter because I could explain the [scratched out] everything what I say.

[PAGE BREAK]

[Paulone:] How long shall I wait for an interpreter?

[PAGE BREAK]

[Riggin:] This does not require you to explain anything.  You get to do that in court.  I am going to advise you of the charges, maximum penalties and your rights to an attorney.  I [scratched out] do not know how long it will be until an interpreter is available, but I will continue to contact one if you want to wait.

[PAGE BREAK]

---

[41] It is unclear to whom "they" refers.

[Paulone:] enuff of waiting too long — go ahead what you have to do with me. Write down what is my first step?

[PAGE BREAK]

[Riggin:] Okay.  Talk to your lawyer.  We do advise you to have a lawyer when you come to court.  Please read and sign this notice.

This is the phone # and address of Public Def.  If you want them to represent you, call right away.

If you come to court without a lawyer, you may have to represent yourself.

[PAGE BREAK]

[Riggin:] I am releasing you on Personal Recognisance [sic].  Please read and ask any questions.

[Paulone:] My mind is Blocked [sic].  it [sic] is hard for me to read too much emotional.

[Riggin:] Please call me anytime today if you have any questions.  Important that you <u>must</u> come to court.

[Paulone:] No need make an appt.   Just send me in mail right?

[Riggin:] Your court date will be mailed.

[PAGE BREAK]

[Paulone:] Will I have to pay $1,000 plus $500[?]  How soon shall I pay[?]

[Riggin:] Judge will determine your guilt or innocence at court.  He/she will also determine penalty.  Maximum is shown.  There is no minimum.

[Paulone:] To be honest with you my mind is blocked.  Shall I keep your paper that we wrote so I can remember what I expect to do[?]

[PAGE BREAK]

[Riggin:]  Normally I would ask these questions but I need you to complete this initial appearance questionnaire.  Answer highlighted areas.

Any other arrests or criminal charges?

[Paulone:] <u>Current</u>

[Riggin:] This is so I can have an interpreter in court. Fill in highlighted areas. I will give you a copy of everything I ask you to sign.

[PAGE BREAK]

[Paulone:] <u>#5</u> Need to explain more? please

[PAGE BREAK]

[Riggin:] May not apply to you—some people have certain medical needs that need to be accommodated.

[Paulone:] Thyroid.

[Riggin:] Something that would impact your presence in court.

[Riggin:] Here are the charges against you and the maximum penalties. Do you have any questions? 1 & 2 are must appears and you must come to court. 3 and 4 are payable tickets.

[Paulone:] As you see refuse to sign because he didn't explain to clear & tried to encourage me to [illegible]. I need to give me time to read, the print is very fine!

[PAGE BREAK]

[Riggin:] Everything is on the last form that you signed. I have given you a copy.

[Paulone:] Now, shall someone will bring me to get my car— My friend is out of town. My pager is (dead) battery. I need recharge—I left it in my car.

[Riggin:] You are on your own. Do you need a cab?

[Paulone:] A cop wrote me a note. Where is it[?]

The "Initial Appearance Questionnaire," which Paulone completed and Riggin signed, and the "Initial Appearance Report," which Riggin completed and both Riggin and Paulone signed, have also been submitted. *See* Ex.2B & Ex.2C to State MSJ (ECF 53-5 & 53-6). The

Questionnaire contains only personal information regarding Paulone, such as addresses, place of birth, occupation, and employer. The Report contains a certification by Riggin that she "INFORMED [Paulone] of each offense charged and of the allowable penalties, including mandatory penalties, if any"; that she "REQUIRED [Paulone] to read the Notice of Advice of Right to Counsel"; and that she "ADVISED" Paulone of the consequences of "appearance for trial without a lawyer." The Report also contains Riggin's "Pre-Trial Release Determination," which was that Paulone "may be released on personal recognizance because it will reasonably assure [Paulone]'s appearance," subject to the conditions that Paulone "[b]e of good behavior & maintain the peace, [n]otify the court of any address change," and, of particular note, "[m]inimally, do not drive for 12 hrs." At the bottom of the Report is a "Receipt" section, signed by Paulone, which states: "I have [ ] read [x] had read to me the offense(s) for which I am charged, the conditions of release, the penalty for violation of the conditions of release, [and] the Notice of Advice of Right to Counsel."

After the conclusion of the initial appearance, a staff member of the FCADC called a cab for Paulone. Paulone 7/9 Dep. at 82. Paulone recounts: "The cab took me to my car . . . . And I drove my car home from there. When I got home, I was talking to my house-mate and my son and my son, good thing, thought to ask me about my license and whether or not I had it. And I said well of course I had my license with me and I went to look in my purse to find it . . . ." *Id.* As it turned out, Paulone's license had been confiscated at the detention center, but Paulone claims she "had no idea that [her] license was taken," because no one had communicated that fact to her. *Id.* Paulone states: "[T]o not even have my driver's license when I drove away . . .

was . . . very scary and that made me realize that I should've had an interpreter so that I could've understood everything and had everything explained to me before I even left." *Id.* at 98.

Quoting the Eleventh Circuit's discussion in *Bircoll v. Miami-Dade County*, *supra*, 480 F.3d 1072, the State concedes the obligation to "take the steps 'reasonably necessary to establish effective communications with a hearing-impaired person after a DUI arrest.'" State MSJ at 8 (quoting *Bircoll*, 480 F.3d at 1087). But, it maintains that the accommodations that are reasonably necessary "'will depend on all the factual circumstances of the case.'" State MSJ at 8 (quoting *Bircoll*, 480 F.3d at 1087). In its view, "the undisputed evidence demonstrates that Ms. Paulone and Commissioner Riggin were able to communicate effectively by way of written notes." State MSJ at 6. Although the State recognizes that "Ms. Paulone's preferred method of communication was a sign language interpreter," it observes that "none was available in the early morning hours of August 1, 2008, despite the efforts of court personnel to obtain the services of an interpreter." State MSJ at 11. Moreover, under *Bircoll*, the State contends that it is "clear" that Riggin and Paulone "achieved the effective communication required by the ADA." *Id.* Therefore, it claims that it is "entitled to judgment as a matter of law." *Id.*

In contrast, plaintiff maintains that even a "cursory review of the notes would indicate that Ms. Paulone did not in fact understand why she was before the Commissioner." Mem. in Support of Pl. Response to Mot. for Summ. J. of Def. State of Md. ("Pl. Opp. to State MSJ") at 2. Pointing out that, "like many deaf people," she "has serious deficiencies in her comprehension of English," and that "English is [her] second language,"[42] Pl. MSJ at 1-2,

---

[42] Case law in this circuit recognizes that, for some persons who are deaf, ASL is a "primary language." *EEOC v. Federal Express Corp.*, 513 F.3d 360, 364 (4th Cir.), *cert. denied*, 129 S. Ct. 343 (2008). In *Federal Express*, the complainant, Lockhart, "use[d] ASL to

Paulone observes: "Even the Commissioner admitted she would normally ask questions, but Ms. Paulone was reduced to completing the initial appearance questionnaire on her own." *Id.* As evidence of the inefficacy of the communication, Paulone cites her query whether "her thyroid issue would be something that would need to be accommodated in court" and her request for "more explanation of '#5.'" *Id.* Further, she underscores that she "was not even aware that her driver's license had been confiscated, nor that some of the paperwork she had signed previously contained a section denoting temporary driving privileges." Pl. MSJ at 3. Noting that "[c]ommunication is a two-way endeavor," plaintiff suggests that her "limited English proficiency was a barrier to both her expressive and receptive communication." Pl. Opp. to State MSJ at 2 (citation omitted). In this regard, she contends that "the commissioner communicated with Ms. Paulone using written notes which included legal jargon (such as 'must appears,' a verb phrase used as a plural noun)." Pl. MSJ at 3. In sum, she argues: "If the commissioner thought that an interpreter [was] necessary such that she called around to find one, the interpreter was no less necessary because she could not secure one. If notes would not have been sufficient before the interpreter search, they cannot suffice by default afterwards." Pl. Opp. to State MSJ at 2.

The Justice Department's regulations implementing Title II of the ADA are instructive. As noted, they require public entities to "take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a). Moreover, the regulations require public entities to "furnish appropriate auxiliary aids and services where necessary," *id.* § 35.160(b)(1),

---

communicate," and had "studied English formally, but ha[d] never mastered the language." *Id.* "English was Lockhart's second language, and . . . his use of written English was, in his own words, 'not very good.'" *Id.* at 366.

and provide explicitly that, "[i]n determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities." *Id.* § 35.160(b)(2). The Justice Department's commentary on the regulations further states that a public entity "shall honor the choice" of auxiliary aid or service expressed by the person with disabilities, "unless it can demonstrate that another effective means of communication exists or that use of the means chosen" would fundamentally alter the program, service, or activity of the public entity at issue, or would create an undue financial or administrative burden. 28 C.F.R. part 35, App. A; *see also* 28 C.F.R. § 35.164 (standard of fundamental alteration or undue financial or administrative burden).

Of import here, the commentary also states:

> Although in some circumstances a notepad and written materials may be sufficient to permit effective communication, in other circumstances they may not be sufficient. For example, a qualified interpreter may be necessary when the information being communicated is complex, or is exchanged for a lengthy period of time. Generally, factors to be considered in determining whether an interpreter is required include the context in which the communication is taking place, the number of people involved, and the importance of the communication.

It is undisputed that the State did not provide an ASL interpreter, which was the auxiliary aid or service requested by Paulone. Therefore, the burden is on the State to "demonstrate that another effective means of communication" was provided.[43] 28 C.F.R. part 35, App. A.

In *Bircoll*, *supra*, 480 F.3d 1072, on which the State relies, the Eleventh Circuit affirmed a grant of summary judgment in favor of county police on a deaf arrestee's ADA claim. Bircoll,

---

[43] The State does not appear to contend that provision of an interpreter would fundamentally alter the initial appearance procedure, or present an undue financial or administrative burden under 28 C.F.R. § 35.164. Such an argument would be belied by the fact that the State attempted to provide an interpreter in this case, and apparently provides interpreters as a matter of policy.

who was arrested for DWI, alleged that the police failed to obtain an interpreter to read a consent warning to him prior to administration of an "Intoxilyzer test that accurately measured Bircoll's impairment, or lack thereof." *Id.* at 1087. The court recognized that the ADA required the police to "take appropriate steps to ensure that . . . communication with Bircoll was as effective as with other individuals arrested for DUI." *Id.* However, based on the Justice Department's regulations, the court stated: "In many circumstances, oral communication plus gestures and visual aids or note writing will achieve effective communication. In other circumstances, an interpreter will be needed. There is no bright-line rule, and the inquiry is highly fact specific." *Id.* Upon examination of the factual circumstances before it, the *Bircoll* Court concluded that effective communication was achieved, and thus there was no ADA violation.

However, *Bircoll* is factually distinguishable from the case at bar. In contrast to Paulone, Bircoll was not entirely deaf, but had "a twenty percent hearing capacity when using his hearing aid," and could "understand about half of what is said when he is lipreading." *Id.* Moreover, a police officer "read the consent form aloud to Bircoll twice," in "lighted conditions," so that he could read the officer's lips. *Id.* at 1088. In addition, unlike Paulone, Bircoll could "read, write, and speak in English," and therefore could read and understand the consent warning provided to him in written form. *Id.* at 1087-88. Also, Bircoll's consent warning was "short and not complex," and Bircoll testified that he was aware, before his arrest, of the consequences of taking and failing the "Intoxilyzer" test, and the consequences of refusing the test. *Id.* at 1087.

This case is also distinguishable from *Ryan v. Vermont State Police*, 667 F. Supp. 2d 378 (D. Vt. 2009), in which, by summary judgment, the court rejected a deaf arrestee's claim of an ADA violation in connection with his post-arrest "booking." In *Ryan*, the booking process was

videotaped and submitted in evidence on the summary judgment motion. *Id.* at 389. The court explained, *id.* at 390:

> Ryan, who can read, was given a written citation upon the start of the booking process. The document advised Ryan of the reason for the arrest. He is observed putting on his reading glasses and reading the citation. Only five basic pedigree questions were posed to Ryan. Ryan answered four of the five questions orally, exhibiting an understanding of the nature of each specific inquiry. Only when asked about any prior aliases did Ryan express an inability to understand and the officer then wrote down the word "alias" to explain his question. Ryan promptly answered the question.

The *Ryan* Court also observed that "Ryan did not request to use a TTY telephone nor any other electronic aid," and commented: "This is perhaps because, as the tape reveals, communication between Ryan and the booking officer was effective." *Id.*

Here, plaintiff's command of written English is more limited than that of the plaintiffs in either *Bircoll* or *Ryan*. Moreover, the information generally communicated at an initial appearance in Maryland (*see* page 52, *supra*), including notification of the charges against a defendant, the minimum penalties, the right to counsel, and the conditions of release, is much more substantial than the limited information apparently conveyed in *Bircoll* or *Ryan*.

As noted, whether an accommodation is reasonable is ultimately a question of fact. *Pandazides*, *supra*, 13 F.3d at 833. *See also Center v. City of West Carrollton*, 227 F. Supp. 2d 863, 870 (S.D. Ohio 2002) (denying summary judgment on deaf complainant's ADA claim, where police officer used handwritten notes, rather than an ASL interpreter, to communicate with complainant, finding "a genuine issue of material fact as to whether communication through handwritten notes constituted an effective auxiliary aid"). Although the parties agree as to the underlying facts, I cannot conclude that either party is entitled to summary judgment with respect to the ultimate factual question of whether the written notes exchanged between Riggin and

Paulone ensured effective communication, and therefore constituted reasonable accommodation under the ADA.

Nevertheless, even in the light most favorable to Paulone, there is no evidence of an intentional violation of the ADA. Rather, the undisputed evidence is that Riggin attempted to procure an ASL interpreter, albeit without success, and that Paulone did not want to wait any longer. It is also undisputed that the detention center (apparently including the district court commissioner's office) is subject to a contract that provides for interpretive services to be provided on an hour's notice. To be sure, Riggin commented that "it often takes an hour or two, and sometimes more, from the time of a request for an interpreter to come to the Commissioner's Office." Riggin Aff. ¶ 3. Her comment, however, is a far cry from showing a pattern of failure to provide interpreters that would evince a deliberate indifference to the rights of deaf arrestees. Indeed, plaintiff has not adduced any evidence to support a finding that the failure to provide an interpreter was anything other than an unfortunate, isolated occurrence. Because plaintiff cannot show that the State's failure to provide her with an interpreter at her initial appearance was either intentional or deliberately indifferent to her rights under the ADA, plaintiff cannot recover an award of damages as to this aspect of her claim. To that extent, summary judgment will be granted to the State.

### F. Victim Impact Panel & Alcohol Education Class

#### 1. Facts

The facts concerning Paulone's required attendance at the MADD victim impact panel and the alcohol education class are largely undisputed. They are drawn from documentary evidence (including the records of the District Court of Maryland from Paulone's DWI case;

"case note" records of DDMP; and correspondence between Paulone, her counsel, her DDMP monitors, and various service providers),[44] as well as an affidavit of Mark Lucas (one of Paulone's DDMP monitors) and Paulone's deposition testimony.

The State has provided a true test copy of the entire docket for Paulone's DWI case in the District Court of Maryland. DWI Case Docket, Ex.2 to State Opp. (ECF 62-3). It reflects that on August 1, 2008, Paulone filed with the district court a "Request for Accommodation by Persons with Disabilities," on a form provided by the court, indicating that she requested an ASL interpreter.[45] DWI Case Docket at 25. Although the form does not expressly indicate that the request is limited to a particular hearing or event, it includes a space to state a "Hearing/Trial date," in which Paulone wrote "Pending." *Id.*

The parties agree that, when the case was called for trial on October 7, 2008, *id.* at 10, plaintiff was provided with an ASL interpreter, and was represented by counsel. As noted, the district court granted Paulone probation before judgment ("PBJ") with respect to the DWI charge. The district court ordered supervised probation by DDMP and, as "special conditions" of Paulone's probation, ordered her to "[s]ubmit to alcohol and drug evaluation, testing, and treatment **as directed by your Supervisor**" and to "[a]ttend Victim Impact Panel meetings **when notified** *by DDMP*." *Id.* (boldface emphasis added; italics indicate handwritten addition to printed form by district court).

Paulone reported to DDMP for intake on October 8, 2008, and met with intake reviewer Krissie Smith-Alvey. DDMP's case notes for that date indicate that Paulone was assigned to

---

[44] No party disputes the authenticity of any of the documentary evidence.

[45] Paulone apparently completed this form during her initial appearance with Commissioner Riggin.

DDMP monitor Lorraine Halpin, and was instructed to meet with Halpin within 48 hours. *See* DDMP Case Notes at 7, Ex.3C to State MSJ (ECF 53-10). Smith-Alvey's notes also state, in large, bold letters: "**NEEDS INTERPRETOR** [sic] **– DEAF**." *Id.* DDMP had some difficulty in procuring the services of an ASL interpreter, however, and so plaintiff's initial meeting with Halpin did not occur until November 10, 2008. *Id.* At that meeting, which was facilitated by an interpreter, Halpin informed Paulone that she was required to undergo a substance abuse evaluation. *Id.* A follow up appointment with Halpin, to be facilitated by an ASL interpreter, was scheduled for January 2009. *Id.*

At some point, Paulone received an "Addendum to Order of Probation," which required, "as a condition of probation," that Paulone attend a MADD victim impact panel for intoxicated drivers on February 4, 2009, at the Evangelical Reformed Church of Christ in Frederick. Ex.13 to Pl. MSJ (ECF 52-17). The Addendum also instructed Paulone to bring "a copy of this referral form," along with a "$30.00 money order payable to MADD."[46] *Id.* In addition, it contains the printed notation, "Monitor/Agent: Halpin" in its upper right-hand corner. It is not clear when or by whom Paulone was given the Addendum, however, because the Addendum is not dated or signed. Nor does the Addendum appear on the DWI Case Docket. Because the Addendum does not appear on the docket, and Halpin was not assigned as Paulone's monitor until after the hearing in the district court on October 7, 2008, it would seem that the Addendum was given to Paulone by Halpin or another DDMP monitor.

_____

[46] Paulone has also submitted a page from MADD of Maryland's website, which lists the victim impact panels held in various counties throughout Maryland, and states: "YOU MUST BE COURT ORDERED TO ATTEND THE PANEL!!" Ex.15 to Pl. MSJ (ECF 52-19) (emphasis in original).

On January 23, 2009, Halpin wrote to Paulone via email, rescheduling their January appointment to February, due to difficulty in arranging an interpreter. DDMP Case Notes at 6. Halpin also stated: "**The State is not responsible to provide interpretation services for your alcohol evaluation, testing and treatment** . . . . You will need to make your own arrangement for an interpreter for the MADD meeting scheduled on February 4th as **the State is not responsible for that either**." *Id.* (boldface emphasis in original).

As noted, Paulone received an initial substance abuse evaluation in January 2009 from Laura Dreany-Pyles of DASAM. On January 29, 2009, Dreany-Pyles wrote to Halpin, stating: "Based on what Ms. Paulone has reported and the results of this evaluation it is not evident that this person is in need of treatment. It is my clinical impression that she does not have an alcohol abuse or dependence problem." Ex.2 to Pl. MSJ (ECF 52-5). Dreany-Pyles also commented: "Ms. Paulone has shown me the court papers regarding the class and meetings she may have to attend. It is important that a sign language interpreter be there so she can get the full understanding of what is being taught." *Id.*

Paulone attended the MADD victim impact panel on February 4, 2009. No interpreter was present and, according to Paulone's deposition testimony, she "didn't understand a thing that was being said." Paulone 7/9 Dep. at 28.

On February 19, 2009, Paulone met with DDMP monitor Mark Lucas (Halpin was out sick that day). DDMP Case Notes at 5. The meeting was facilitated by an interpreter. *Id.* In his notes of the meeting, Lucas recorded that Paulone confirmed that she had attended the MADD panel; "**HOWEVER**," he noted, "<u>she did not bring an interpreter</u> with her as instructed by Ms. Halpin so she only read a MADD brochure and sat in the room until it was over." *Id.* (boldface

and underlined emphasis in original). Lucas also observed that Paulone had not yet enrolled in "treatment." *Id.* According to Lucas, Paulone "spent some time saying the State is responsible for [providing an] [i]nterpreter at treatment," but Lucas "reminded her that Ms. Halpin told her that is not the case." *Id.* He also told Paulone "that this issue was forwarded to the Attorney General's office and they concur that [Paulone] must provide [her] own interpreter <u>outside</u> of the Probation Office." *Id.* (underlined emphasis in original). Lucas stated: "This point was repeated thoroughly with [Paulone] until she acknowledged she understood it." *Id.*

Lucas directed Paulone to enroll in a "6 week or 12 hour alcohol education class," no later than March 17, 2009. *Id.* (emphasis omitted). He also gave her a printed list of class providers. *Id.*; *see also* Provider List, Ex.19 to Pl. MSJ (ECF 52-23). The list enumerates approximately ten providers, including DASAM (at its Baltimore City address), along with contact information for other resources. *See* Provider List. In his affidavit, Lucas explains that an "offender is not required to attend a specific program on the list;" rather, "an offender is simply required to go to a program that is certified by the State." Lucas Aff. ¶ 16, Ex.3 to State MSJ (ECF 53-7). According to Lucas, the list "represents what DDMP believes to be all of the State-certified addictions programs offered in Frederick County, and the monitors provide the list to offenders as a courtesy." *Id.*

On Paulone's copy of the list, DASAM was circled and marked with an asterisk, by hand. *See* Provider List. In paragraph 18 of his affidavit, Lucas explains:

> In order to avoid complaints from treatment providers that [DDMP] employees steer offenders to certain treatment programs, [DDMP] policy prohibits agents and monitors from directing offenders to go to a specific treatment program. I therefore did not direct Ms. Paulone to go to a specific program on the list I gave her. I believe, however, that I circled Deaf Access

Services at Maryland and placed an asterisk next to it, because I was aware that Ms. Paulone was deaf.

On February 26, 2009, Paulone's attorney, Laura Venezia, wrote to Halpin, seeking "to clarify some of the information Ms. Paulone was provided during the meeting" with Lucas. Venezia Letter, Ex.4 to Pl. MSJ (ECF 52-7). Venezia stated, *id.*:

> Ms. Paulone was told that she is required to complete a 12 hour DUI Education program by March 12, 2009. From my recent discussions with her, I don't think she understands where she is to take this course or why as her substance abuse evaluation did not indicate that she had an alcohol abuse or dependence problem.

Further, Venezia remarked that "Ms. Paulone was told that she would need to secure the services of an interpreter for the course. If this is a requirement of her probation, your office should be providing the interpreter." *Id.* Venezia concluded: "Finally, regardless of who provides the interpreter, I would imagine that with the additional scheduling overlay, Ms. Paulone may need a little more time to complete the requirement." *Id.* Venezia asked whether Halpin "would be willing to be flexible on this point, so long as Ms. Paulone can demonstrate adequate progress toward scheduling." *Id.*

DDMP's case notes indicate that Venezia's letter was "forwarded to the State's Attorney General's office for a response." DDMP Case Notes at 4. The case notes also reflect that Halpin spoke with Paulone via telephone relay on March 11, 2009. *Id.* at 3. In response to Halpin's query whether Paulone had enrolled in the alcohol education class, Paulone responded that she was "still waiting to see when we can get interpreters to be there." *Id.* Halpin "reminded [Paulone] that she was to be enrolled . . . by 03/17/09." *Id.*

On March 17, 2009, Paulone met with Halpin in person; the meeting was facilitated by an interpreter. *Id.* Paulone brought with her a letter from an addictions counselor at Crossroads

Centers ("Crossroads"), which was one of the course providers on the list that Lucas had given Paulone. The letter, dated March 17, 2009, stated that Paulone had come to Crossroads earlier that day for a "scheduled evaluation," but that Crossroads had been "unable to evaluate her," because she "showed up without an interpreter." Ex.17 to Pl. MSJ (ECF 52-21). In her case notes, Halpin expressed surprise that Paulone went to Crossroads only "THAT MORNING FOR AN EVALUATION," DDMP Case Notes at 3 (capitalization in original), and observed that "it was a month ago that Mr. Lucas told her she needed to be in [the class] by the 17th of this month." *Id.* Halpin also noted: "A violation will have to be sent to the courts stating that [Paulone] is still not in compliance . . . ." *Id.*

Venezia emailed Halpin on March 18, indicating that Venezia had spoken with an attorney in the Office of the Attorney General, and that "we are now pretty much on the same page about interpreters; that is, you all provide them for meetings with you, but the provider of services off site is required to provide them there." *Id.* Venezia asked Halpin: "[W]hat will likely happen if the interpreter issue slows down Joette's compliance?" *Id.* Halpin commented in the case notes that Paulone "can't afford [an] interpreter and she runs to her attorney after each visit." *Id.*

On March 27, 2009, Halpin prepared a "Statement of Charges" and "Request for Summons" for violation of probation, which Lucas approved on March 31. DWI Case Docket at 3. The Statement of Charges stated, *id.* at 4:

> Ms. Paulone has been directed to get an evaluation and treatement as directed on her court order on several occasions by this monitor and by . . . Mark Lucas. On 2/19/09, Ms. Paulone met with . . . Mark Lucas and was given a deadline date of 3/17/09 to be enrolled into an alcohol education class. Ms. Paulone went to the Crossroads Program on the morning of 3/17/0 without an interpreter and could not be given an evaluation. She had been directed to provide her own interpreter or

make arrangements for an interpreter to be present for the evaluation/education program. To date, Ms. Paulone has not yet enrolled into an alcohol education/treatment program.

The Statement of Charges did not mention Paulone's attendance at the MADD panel without an interpreter. The district court issued a summons on April 3, 2009. *Id.* at 5.

Thereafter, Paulone arranged to take the alcohol education course with Dreany-Pyles, the deaf addiction counselor at DASAM who had performed her evaluation.[47] Dreany-Pyles wrote to Lucas and Halpin on May 7, 2009, informing them that "Ms. Paulone is in our DWI education class as of April 29, 2009. We will meet weekly and the classes will be finished on June 3, 2009." Ex.3 to Pl. MSJ (ECF 52-6).

Paulone met with Lucas on May 29, 2009, and indicated that she was on schedule to complete the class as of June 3, 2009. DDMP Case Notes at 1. Lucas informed her that she still needed to go to the district court hearing on the violation of probation charge, which was scheduled for June 2. *Id.*

On June 2, 2009, Paulone attended the district court hearing with counsel. Halpin requested dismissal of the violation of probation charge, as well as termination of the supervision of Paulone's probation. The court granted both requests. *See* Tr. of VOP Hearing, Ex.3 to State Opp. (ECF 62-4).

### 2. Victim Impact Panel

Paulone contends that she is entitled to summary judgment with respect to the State's failure to provide an interpreter at the victim impact panel. She asserts that victim impact panels

---

[47] In her deposition, Paulone testified that DASAM was "one of the last places I contacted because Baltimore is so far for me and with my work hours it would've been very difficult. So I had first focused on the places in Frederick to try to get services from them." Paulone 7/15 Dep. at 56.

are a component of State court-ordered probation. She points out that "one must be court ordered to attend a Victim Impact Panel Meeting," and "one must also bring one's court paperwork to the meeting to gain admittance." Pl. MSJ at 13. Citing 28 C.F.R. § 35.130(b), which provides that a public entity may not discriminate on the basis of disability, either "directly or through contractual, licensing, or other arrangements,"[48] Paulone contends that the State is required to provide reasonable accommodations to offenders with disabilities who are ordered by the court to attend the panels. Pl. MSJ at 13-14.

The State addresses the victim impact panel in its Opposition to Paulone's summary judgment motion, but not in its own summary judgment motion. Nevertheless, it contends that it is entitled to summary judgment on this point. *See* State Opp. to Pl. MSJ at 4. The State does not argue that Title II of the ADA is inapplicable to court-ordered attendance at a victim impact panel. But, it advances three grounds to support its position. In my view, each lacks merit.

First, quoting *Kiman v. New Hampshire Department of Corrections*, 451 F.3d 274, 283 (1st Cir. 2006), the State argues: "The reasonable accommodation component of the ADA 'usually does not apply unless triggered by a request.'" State Opp. to Pl. MSJ at 4-5 (quoting *Kiman*). The State asserts that there is no evidence that Paulone requested an interpreter at the MADD panel. It maintains that the DDMP case notes "reflect simply that Ms. Paulone's

---

[48] Paulone claims that the victim impact panels are not places of public accommodation. If the panels were public accommodations, and thus subject to Title III of the ADA, MADD itself would be required to provide reasonable accommodations for persons with disabilities.

The State does not contest Paulone's assertion that the MADD panels are not subject to Title III. Therefore, I assume, without deciding, that MADD was not obligated to provide reasonable accommodations for attendees with disabilities at the impact panels, and I need not consider whether an obligation to provide reasonable accommodations on the part of MADD would relieve the State of its obligation to provide reasonable accommodations to offenders with disabilities who are required by court order to attend the panels.

monitor instructed her to take an interpreter with her to the MADD meeting." State Opp. to Pl. MSJ at 5.

This argument is not persuasive. As the *Kiman* Court pointed out, the "request requirement," which "usually" applies, is a function of the fact that "a person's 'disability and concomitant need for accommodation are not always known . . . until the [person] requests an accommodation.'" *Kiman*, 451 F.3d at 283 (citation omitted). In some cases, however, a person's "'need for an accommodation will be obvious; and in such cases, different rules may apply.'" *Id.* (citation omitted). *Accord Robertson*, *supra*, 500 F.3d at 1197-98 ("[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation."); *Duvall*, *supra*, 260 F.3d at 1139 ("When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test.").

Here, plaintiff's DDMP monitors were well aware that Paulone required an ASL interpreter. She had specifically requested one, both at her court appearance and at her intake meeting with DDMP. Indeed, DDMP provided an interpreter at every meeting plaintiff had with her DDMP monitors. And, the State admits, as it must, that Halpin explicitly told Paulone that DDMP would not provide an interpreter for the MADD panel. Even assuming that Halpin's statement was not triggered by an affirmative request from Paulone in regard to the MADD panel, the State can hardly avoid liability for failure to provide an interpreter simply by anticipating Paulone's request for reasonable accommodation and denying it preemptively.

Second, the State argues that, "[e]ven if Ms. Paulone had asked [DDMP] to provide an interpreter for the MADD meeting," it would still be entitled to summary judgment, because the "state district court, not [DDMP], was required to provide an interpreter in connection with Ms. Paulone's court-ordered attendance at victim impact meetings." State Opp. to Pl. MSJ at 6. In this regard, the State once again cites *Rosen, supra*, 121 F.3d 154.

The deaf plaintiff in *Rosen* was court-ordered to attend Alcoholics Anonymous meetings, for which no interpreter was provided. The Fourth Circuit rejected Rosen's claim that Montgomery County was liable under the ADA for the failure to provide an interpreter, stating that Rosen's "claim would be against the court, an entity over which the County exercises no control whatsoever." *Rosen*, 121 F.3d at 159. Similarly, the State argues here that Paulone has no claim against DDMP, because Paulone's attendance at the MADD panel was ordered by the district court. Moreover, the State contends that Paulone has no viable claim against the district court, because she never asked the district court to provide an interpreter at the MADD panel. State Opp. at 6-7.

This argument also does not withstand scrutiny. As noted, the district court ordered Paulone to "[a]ttend Victim Impact Panel meetings when notified *by DDMP*." DWI Case Docket at 10 (italics indicate handwritten addition to printed form by district court). And, the "Addendum" that directed Paulone to go to the particular panel meeting that she attended apparently originated with Halpin, not the court. It is by no means clear that a request for an interpreter at the MADD panel would properly have been directed to the court, rather than DDMP, as the State suggests. In any event, regardless of whether plaintiff's claim is directed to the conduct of the district court or DDMP, both were on notice of plaintiff's need for

accommodation.  As indicated, plaintiff had specifically requested an interpreter at trial, and the court proceedings were facilitated by an ASL interpreter; DDMP was on notice after plaintiff's initial meeting.

*Rosen* is inapposite, because in that case the defendant was Montgomery County, which exercised no control over the requirements of probation imposed by the Maryland State court.  In contrast, plaintiff's claim is directed against the State of Maryland.  For purposes of the State's liability, it makes no difference whether the responsibility for ADA compliance fell on DDMP or the district court, because both entities knew of plaintiff's need for an interpreter, and both entities are arms of the State, which is the defendant here.

In *Tennessee v. Lane*, *supra,* 541 U.S. 509, the Supreme Court upheld the State of Tennessee's liability for its courts' discrimination against persons with disabilities, making clear that the ADA prohibits "a State's failure to provide individuals [with disabilities] with a meaningful right of access to the courts."  *Id.* at 533.  Here, the ADA required the State of Maryland to make reasonable accommodations for persons with disabilities who are subject to requirements of probation.

Finally, the State argues that Paulone "did not suffer any injury as the result of attending the MADD victim impact panel without an interpreter," because DDMP "did not notify the state district court that Ms. Paulone had attended the MADD victim impact panel without an interpreter and she was not charged with violating the condition of her probation that she attend." State Opp. at 7.  But, this argument disregards the plain text of the ADA, which mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public

entity . . . ."  42 U.S.C. § 12132.  Paulone was required by the State to attend the victim impact panel, but was unable to understand anything that transpired at the panel, due to her disability. The State's alleged refusal to provide a reasonable accommodation to enable Paulone to benefit from this "service, program or activity" of the State is precisely the sort of everyday discrimination against persons with disabilities that the ADA was enacted to address.  Again, plaintiff's compensatory damages may be minimal, but they at least include the $30 that plaintiff paid to attend a panel at which she could understand nothing.

The undisputed material facts demonstrate that DDMP intentionally denied plaintiff the reasonable accommodation of an ASL interpreter at the MADD victim impact panel. Accordingly, plaintiff is entitled to summary judgment with respect to the matter of the victim impact panel.

### 3. Alcohol Education Class

Judge Quarles denied the State's earlier motion for summary judgment with respect to the alcohol education class, because at that juncture, the State had "provided no evidence that one of the eight DUI education class providers . . . had a deaf accessible program."  718 F. Supp. 2d at 636.  Judge Quarles concluded that "Maryland may be liable if none of the programs Paulone was required to attend provided interpreters," *id.*, reasoning:

> Paulone alleges that Maryland's failure to provide her with timely access to an interpreter led to a violation hearing, which required her to incur the cost of an attorney for that court appearance.  Maryland law requires [DDMP] to determine whether a probationer is complying with her probation conditions and to notify the court of noncompliance.  Thus, [DDMP] was legally required to notify the court of Paulone's failure to complete her alcohol education requirements. But, if the State wrongfully refused to provide Paulone with an interpreter for her alcohol education classes, a reasonable jury might find that it caused the delay and is liable for Paulone's expenses to defend herself at the hearing.

*Id.* at 636 n.30 (citations omitted).

The State points to the uncontested evidence, which it has now produced, that DASAM was on the list provided to Paulone, and that Paulone ultimately took the course with Dreany-Pyles of DASAM via videophone. In light of this evidence, the State argues that "there can be no genuine dispute that the State provided Ms. Paulone with an alcohol education class taught in American Sign Language," and therefore the State is entitled to summary judgment.

In response, Paulone contends that "the State misconstrues the nature of Ms. Paulone's complaint." Paulone acknowledges that she "was ultimately able to secure accessible alcohol education classes," but "contends, rather, that because the process of doing so was hindered by her need to find accessibility because of her deafness, the State discriminated against her by not extending her deadline to comply." Pl. Opp. to State MSJ at 3.

Paulone notes that, in the letter of February 26, 2009, from her attorney to Halpin, her attorney asked DDMP to be "flexible" with the deadline for Paulone's enrollment in the alcohol education course, due to the "additional scheduling overlay" of obtaining an interpreter for the course. She contends that it would have been a reasonable accommodation "for the State to modify its time line to allow Ms. Paulone additional time to comply," and that it would "also have been a reasonable accommodation for the State to withdraw its show cause order soon after it received confirmation of Ms. Paulone's enrollment" in the course, before her hearing date on the VOP charge. Pl. Opp. to State MSJ at 4.

In support of her position, Paulone cites *Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996). In *Crowder*, the Ninth Circuit reversed a grant of summary judgment in favor of the State of Hawaii, in a suit by visually impaired persons who used guide dogs, seeking an exemption

from Hawaii's 120-day quarantine on any carnivorous animal entering the state, which was imposed to protect against the importation of rabies into Hawaii. *Id.* at 1481. Noting that "the determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry," *id.* at 1486, the *Crowder* Court concluded: "Whether the plaintiffs' proposed alternatives to Hawaii's quarantine for guide dogs constitute reasonable modifications or fundamental alterations cannot be determined as a matter of law on the record before us." *Id.* at 1485. The court reasoned that "inquiry into reasonable modification would necessitate findings of fact regarding the nature of the rabies disease, the extent of the risk posed by the disease, and the probability that the infected animals would spread it," *id.* at 1486, and that there was "a genuine dispute of material fact as to whether the plaintiffs' proposed modifications to Hawaii's quarantine amount to 'reasonable modifications' which should be implemented, or 'fundamental[ ] alter[ations],' which the state may reject." *Id.* at 1485 (quoting ADA).

In Paulone's view, a "trier of fact must determine if the proposed accommodation"—in Paulone's case, an extension of the deadline to enroll in the course, or withdrawal of the VOP charge once Paulone was enrolled—"would constitute a reasonable modification." Pl. Opp. to State MSJ at 5. Therefore, she maintains that the "State is not entitled to Summary Judgment on this matter." *Id.* In her own motion for summary judgment, however, Paulone argues that she is entitled to summary judgment on this point, because there "is nothing in the record which indicates that an extension of time, under these circumstances, would fundamentally alter the nature of the probation program." Pl. MSJ at 16.

As I see it, this case is not in a significantly different posture now with regard to this claim than when Judge Quarles considered it. Judge Quarles ruled that "a reasonable jury might

find that [the State] caused the delay and is liable for Paulone's expenses to defend herself at the hearing." 718 F. Supp. 2d at 636 n.30. The evidence presently before the Court does not suggest that the deadline of March 19, 2009, was anything other than an arbitrary deadline chosen by Lucas. The State has not submitted any evidence to show that the deadline was statutorily required, nor what hardship, if any, the State would have experienced by extending it.

Moreover, Lucas and Halpin, apparently out of adherence to DDMP's policy of not "steering" offenders to particular course providers, did not facilitate Paulone's enrollment in the DASAM class, instead insisting (incorrectly) that it was entirely Paulone's responsibility to ensure that the class she took was deaf-accessible. Nor did Lucas or Halpin withdraw the VOP charge when they were informed, approximately a month in advance of the scheduled hearing on the charge, that Paulone had enrolled in the course. Under these circumstances, a reasonable fact finder could conclude that DDMP denied a reasonable accommodation to Paulone.

Nevertheless, a reasonable fact finder could also conclude that Paulone bears responsibility for her failure to meet the deadline. Paulone could have taken the course from Dreany-Pyles at DASAM in compliance with the deadline; instead, she sought to take the course through Crossroads, which did not have an interpreter available. The jury could conclude that Paulone did not timely explore the option of taking the course through DASAM (apparently because she assumed she would have to travel to Baltimore to do so).

Accordingly, summary judgment will be denied to both Paulone and the State.

## G. Remedies

In its opposition to Paulone's motion for summary judgment, the State contends that "there is a genuine dispute as to the amount of damages, if any, to which Ms. Paulone is

entitled." State Opp. at 8. Indeed, the State argues: "Paulone has presented no evidence to this Court concerning her alleged damages, and she has not even suggested an appropriate amount of damages to award." *Id.* In response, plaintiff contends that she "has provided documentation of her financial damages," and has "provided support for her contention that she experienced a great deal of psychological stress and injury." Pl. MSJ at 16.

Even if plaintiff has provided such evidence in discovery, I agree with the State that Paulone has not placed it on the record at the summary judgment stage. Moreover, plaintiff seeks declaratory and injunctive relief, in addition to damages. Yet, plaintiff has not proposed a form for such relief to take, nor have the parties addressed the standards that govern whether such relief is appropriate. *See, e.g.*, *Pathways Psychosocial Support Ctr., Inc. v. Town of Leonardtown*, 223 F. Supp. 2d 699, 717 (D. Md. 2002) (recognizing that, although "irreparable harm can be presumed from a violation of civil rights' statutes such as the ADA," plaintiffs must still "demonstrate[] that the . . . injunction they request is necessary to prevent that harm").

Therefore, although the Court will grant plaintiff summary judgment as to liability with respect to one aspect of her claim (*i.e.*, the victim impact panel, as discussed, *supra*), the Court cannot determine, at this juncture, the amount or nature of the relief to which Paulone is entitled.

## H. Conclusion

For the foregoing reasons, the Court will grant the County's motion for summary judgment; will grant Paulone's motion for summary judgment, as to liability only, with respect to her ADA claim against the State in regard to the victim impact panel; will grant the State's motion for summary judgment, as to plaintiff's entitlement to monetary damages only, with

respect to plaintiff's ADA claim concerning her initial appearance; and will deny summary

judgment to both the State and Paulone in all other respects.  An appropriate Order follows.


_____/s/_____
Ellen Lipton Hollander
United States District Judge


Dated: May 3, 2011